HELVERING, COMMISSIONER OF INTERNAL REVENUE, *v.* RANKIN, EXECUTOR.

No. 582.  Argued March 14, 15, 1935.—Decided April 29, 1935.

124

*Assistant Attorney General Wideman,* with whom *Solicitor General Biggs* and *Messrs. James W. Morris* and *J. P. Jackson* were on the brief, for petitioner.

*Mr. John W. Townsend* for respondent.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

The Revenue Act of 1928 (c. 852, §§ 22, 111, 112, 113), provides, as had earlier Revenue Acts, that in computing income from sales of property purchased after February 28, 1913, any excess of the amount realized over cost shall be gain and that any excess of the cost over the amount realized shall be loss. When gain or loss is to be determined on the sale of stock owned outright as an investment, the identification of the shares sold with those purchased ordinarily presents no difficulty. But when the taxpayer has engaged in marginal transactions on a stock exchange, the identification of sales and purchases is frequently impossible. It was, perhaps, primarily to deal with such cases that the Treasury adopted, in 1918,[1]

---

[1] Art. 4, ¶ 60, Regulations No. 33 (Revised), Revenue Acts of 1916 and 1917; Art. 39, Regulations Nos. 45, 62, 65 and 69, Acts of 1918, 1921, 1924 and 1926, respectively; Art. 58, Regulations Nos. 74 and 77, Acts of 1928 and 1932 respectively; Art. 22 (a)–8, Regulations No. 86, Act of 1934.

the so-called "First-in, first-out" rule. That rule appears in Article 58 of Regulations No. 74, under Revenue Act of 1928, as follows:

" When shares of stock in a corporation are sold from lots purchased at different dates and at different prices and the identity of the lots can not be determined, the stock sold shall be charged against the earliest purchases of such stock. The excess of the amount realized on the sale over cost or other basis of the stock will constitute gain."

Applying this rule, the Commissioner of Internal Revenue assessed against Richard B. Turner for the year 1928, a deficiency tax of $11,173.05 on account of gains from his operations on the stock exchange in United Gas Improvement Co. stock. Upon a redetermination by the Board of Tax Appeals, the Commissioner's action was sustained. 26 B. T. A. 1204. The Court of Appeals reversed the Board's decision and directed it to enter a new order in conformity with the court's opinion. 73 F. (2d) 9. Turner having died during the litigation, his executor, Rankin, was substituted. Writs of certiorari were granted in this case, and in *Snyder* v. *Commissioner,* decided this day, *post,* p. 134, in order to determine questions concerning the effect, validity, and applicability of the regulation. The facts found by the Board were these:

In 1926, Turner received in distribution of his father's estate $20,000 in bonds. Wishing to change his inheritance into stock, he opened a marginal account with a stock broker; sold the bonds; and, with the proceeds as margin, purchased, from time to time during that year, an aggregate of 1,200 shares of United Gas Improvement Company stock at a cost of $117,202.50. On this stock the broker received for him, later in 1926, 300 shares as a dividend. There were no further operations in 1926 or in 1927. His marginal account became active in 1928.

At the beginning of the year he was long 1,500 shares of this stock; in May he sold 300 shares for $44,619 net; in June, he bought 1,000 shares for $143,225; in October he sold 500 shares for $73,865; and, in November, 500 shares for $74,115. Thus, at the close of the year, he was long 1,200 shares.

In none of these transactions did the broker deliver to Turner, or Turner to the broker, any stock certificate. No specific certificate of stock was ever bought or sold by the broker for Turner; and none was earmarked or allocated for him in any manner. The purchases and sales affecting his account were made through the medium of street certificates handled by the broker; and the transactions were evidenced solely by debits and credits in his account on the broker's books. Turner first learned these facts after the deficiency assessment. He had always intended to retain ownership on margin of 1,200 shares of the stock, since he had faith in the company and desired to hold them in lieu of the bonds which he had received from the estate of his father. To his business associates, who acted for him in giving orders to the broker, he had made it plain that the 1,200 shares were in the nature of a permanent commitment on his part. An employee of the broker understood that the decedent desired to retain 1,200 shares of the stock to take the place of the bonds which he had received from his father.

On the above facts the Board concluded, as had the Commissioner, that it was impossible to determine the identity of the lots purchased and sold; and that, consequently, the "First-in, first-out" regulation should be applied. In reversing that order the Court of Appeals said: "We think the petitioner's [Turner's] communication to his broker of his intention to hold the 1,200 shares first purchased as an investment was in effect an order to his broker not to sell those shares, and when, two years later,

he ordered the broker to make two sales in lots of 500 shares each, they were, conformably with the original instructions, the 1,000 shares last purchased. The petitioner's instructions excluding from sale the shares first purchased were in effect an identification of the shares later sold as those last purchased.

"While the petitioner, in identifying his shares, might have been more specific in his instructions to his broker, those he gave stand uncontradicted; indeed, they have not been questioned. We think they were enough to take the case out of the rule and that, in consequence, the deficiency tax in issue is invalid to the extent that it is based on gains made in sales of U. G. I. shares reckoned on the purchase price of the original 1,200 shares."

*First.* The Commissioner contends that Turner's communication to his broker of his intention to keep 1,200 shares of United Gas Improvement Co. stock was ineffective to identify the shares to be sold, because, from the very nature of these marginal operations, the shares were incapable of identification by the broker or anyone else. The basis for this contention is the facts that in such transactions no certificate is issued in the name of the customer, or earmarked for or otherwise allocated to him; that all certificates are in the name of the broker or street names; and that all certificates for stock of the same kind are commingled and held by the broker for the common benefit of all dealing in that particular stock. The fallacy of this argument lies in the assumption that shares of stock can be identified only through stock certificates. It is true that certificates provide the ordinary means of identification. But it is not true that they are the only possible means. Compare *Richardson* v. *Shaw,* 209 U. S. 365; *Gorman* v. *Littlefield,* 229 U. S. 19; *Duel* v. *Hollins,* 241 U. S. 523. Particularly is this so when, as here, the thing to be established is the allocation of lots sold to lots purchased at different dates and different

prices.[2]   The required identification is satisfied if the margin trader has, through his broker, designated the securities to be sold as those purchased on a particular date and at a particular price.   It is only when such a designation was not made at the time of the sale, or is not shown, that the " First-in, first-out" rule is to be applied.[3]

*Second.* The validity of the regulation, thus construed, cannot seriously be questioned.   The contention advanced by the taxpayers, both here and in the companion case of *Snyder* v. *Helvering,* that the regulation, as applied to marginal transactions, is invalid under the Fifth Amendment, because it creates a conclusive presumption, must rest wholly on the assumption that the shares traded on margin are incapable of identification.   Since that assumption is erroneous, it is clear that no conclusive presumption is established.   It is, at most, the burden of proof that is affected.   For the margin trader, while being required to establish the identity of the shares in order to avoid the " First-in, first-out " rule, is left free to introduce any relevant evidence.   Nor is he arbitrarily deprived of any of the important attributes of ownership, such as the " right to decide which stock he is going to

[2] The original regulation, Art. 4, ¶ 60, Regulation No. 33 (Revised), read, " When stock is sold from lots purchased at different times and at different prices and the identity of the lots can not be determined as to the dates of purchase, the stock sold shall be charged against the earliest purchases of such stock." It has been suggested that, " Under the language quoted from Regulations 33, [" as to the dates of purchase," omitted in subsequent regulations] it might be argued that the identification intended could have been accomplished merely by recording ' the dates of purchase,' rather than by requiring physical identification of the certificates." Wilkins, Identity of Marginal Transactions, Int. Rev. News, v. 4, no. 7, p. 5 (1931).

[3] Compare *Howbert* v. *Penrose,* 38 F. (2d) 577; *Skinner* v. *Eaton,* 45 F. (2d) 568; *Snyder* v. *Commissioner,* 54 F. (2d) 57; *Commissioner* v. *Merchants' & Manufacturers' Ins. Co.,* 72 F. (2d) 408.

sell." Indeed it is conceded, at least by the taxpayer in this case, that the regulation, as we now interpret it, " provides a useful and reasonable rule for ascertaining what stock was sold in cases where there is no proof, or lack of satisfactory proof, of the fact."

*Third.* If the facts found by the Board of Tax Appeals had been what the Court of Appeals assumed them to be, there would have been such an identification of shares sold with shares purchased as to preclude the Commissioner from applying the " First-in, first-out " rule. The Court of Appeals assumed that, " What Turner did in this case, acting and speaking through his attorney, was to communicate to his broker his intention to hold for investment the shares of U. G. I. he originally purchased." The facts found by the Board of Tax Appeals do not bear out this assumption of the court. The Board's findings were that, " The decedent [Turner] always intended to retain the ownership on margin of 1,200 shares of the United Gas Improvement Co. stock "; and that, " An employee of the broker understood . . . that the decedent desired to retain 1,200 shares to take the place of the bonds which he had received from his father." The difference between the Board's findings and the court's statement of the facts is obviously vital. The court held that Turner's communication of his intention " was in effect an order to his broker not to sell those shares "; that " when, two years later, he ordered the broker to make two sales in lots of 500 shares each, they were, conformably to the original instructions, the 1,000 shares last purchased." But if the employee was told, as the Board found, merely that Turner " desired to retain 1,200 shares [of the U. G. I. stock] to take the place of the bonds which he had received from his father," he would naturally believe that so long as any 1,200 shares of the stock were retained, it was immaterial to which of the lots the sales in 1928 were attributed; and hence there was no identi-

fication. Thus it was only by departing from the facts as found by the Board of Tax Appeals that the court found justification for reversing the Board's decision.

*Fourth*. The Court of Appeals is without power, on review of proceedings of the Board of Tax Appeals, to make any findings of fact. " The Board of Tax Appeals is not a court. It is an executive or administrative board, upon the decision of which the parties are given an opportunity to base a petition for review to the courts after the administrative inquiry of the Board has been had and decided." *Old Colony Trust Co.* v. *Commissioner*, 279 U. S. 716, 725. The function of the court is to decide whether the correct rule of law was applied to the facts found; and whether there was substantial evidence before the Board to support the findings made. See *Phillips* v. *Commissioner*, 283 U. S. 589, 599, 600; *Burnet* v. *Leininger*, 285 U. S. 136, 138; *Old Mission Portland Cement Co.* v. *Helvering*, 293 U. S. 289, 294.[4] Unless the finding of the Board involves a mixed question of law and fact, the court may not properly substitute its own judgment for that of the Board.[5] If the Board has failed to make an essential finding and the record on review is insufficient to provide the basis for a final determination, the proper procedure is to remand the case for further proceedings before the Board. Compare *Helvering* v. *Taylor*, 293 U. S. 507; *Murphy Oil Co.* v. *Burnet*, 287 U. S. 299, 308.[6] And

---

[4] Compare *Tracy* v. *Commissioner*, 53 F. (2d) 575, 578–9; *Slayton* v. *Commissioner*, 76 F. (2d) 497; *Heywood Boot & Shoe Co.* v. *Commissioner*, 76 F. (2d) 586.

[5] Compare *Bishoff* v. *Commissioner*, 27 F. (2d) 91, 92; *Washburn* v. *Commissioner*, 51 F. (2d) 949, 951; *Tricou* v. *Helvering*, 68 F. (2d) 280, 285.

[6] Compare *Royal Packing Co.* v. *Commissioner*, 22 F. (2d) 536, 538; *Commissioner* v. *Langwell Real Estate Corp.*, 47 F. (2d) 841, 842; *Independent I. & C. Storage Co.* v. *Commissioner*, 50 F. (2d) 31, 33; *Kansas City Southern Ry. Co.* v. *Commissioner*, 52 F. (2d)

the same procedure is appropriate even when the findings omitted by the Board might be supplied from examination of the record.[7]

*Fifth.* The Court of Appeals did not comment on the difference between the Board's findings and its own statement of the facts. Apparently it assumed that there was no difference; and reversed the Board's order, believing that it rested upon an erroneous ruling of law. For the court said that the Board made its determination " on the theory that the U. G. I. stock, which from time to time he [Turner] purchased on margin and later sold, could be identified only by certificates; that as no certificates for shares were ever in his name, the shares sold could not be identified as shares purchased in any particular lot or at any particular time or price, and, accordingly, charged the shares sold against those earliest purchased within the ' First in, first out ' rule."

There is nothing in the opinion of the Board to indicate that its decision was based upon the " theory " stated by the court. There is nothing in the record to indicate that any such contention had been made by the Government before the Board; and Turner's petition for review by the Court of Appeals did not claim that the Board had acted upon that "theory."[8] But even if the Board's decision

---

372, 379; *Houston* v. *Commissioner*, 53 F. (2d) 445; *Underwood* v. *Commissioner*, 56 F. (2d) 67, 73; *Eau Claire Book & Stationery Co.* v. *Commissioner*, 65 F. (2d) 125, 126.

[7] Compare *Kendrick Coal & Dock Co.* v. *Commissioner*, 29 F. (2d) 559, 564; *Francisco Sugar Co.* v. *Commissioner*, 47 F. (2d) 555, 558; *Belridge Oil Co.* v. *Helvering*, 69 F. (2d) 432.

[8] The Solicitor General stated in his petition to this Court for certiorari, that the question presented was " whether shares of stock held on margin are capable of identification so that a taxpayer selling part of his holdings may select, as his basis for determining gain or loss, the cost of any particular lot "; and counsel for the Government may have contended in the Court of Appeals, as he did here, that such identification is impossible. It is also true that the Board

had been based on an erroneous rule of law, that would not have justified its reversal, if the findings of fact, governed by the correct rule of law, were sufficient to sustain the decision and had substantial support in the evidence.[9]

*Sixth.* The Court of Appeals did not explicitly hold that the Board's finding as to Turner's communication to his broker was without substantial support in the evidence. The court, in its opinion, does state that, "The evidence shows conclusively that Turner was sentimental about keeping the original 1,200 shares as an inheritance from his father; that his ' intention ' was to retain as an investment the shares originally purchased and sell in speculation the shares more recently acquired." It does not state that the evidence was equally conclusive as to the communication to the broker of this exact intention. There was, it is true, testimony to the effect that " from the very beginning West & Company knew Mr. Turner's intentions and knew he was keeping the first purchase of 1,200 shares"; and the failure of the Board so to find, was assigned as error by the taxpayer in his petition for review. But there was also testimony showing that Turner, during 1928, traded heavily in 20 other issues of stock. The Court of Appeals did not consider whether, in view of this and other evidence, the Board might reasonably have concluded that the testimony as to the broker's knowledge of Turner's intention was not entirely accurate, and that the broker's only clear understanding

of Tax Appeals in other cases has approved the rule for which the Government is now contending. See Stryker *v.* Commissioner, 21 B. T. A. 561; Leng *v.* Commissioner, 22 B. T. A. 149; Seelye *v.* Commissioner, 29 B. T. A. 695; compare Kelchner *v.* Commissioner, 31 B. T. A. 262.

[9] Compare *Lewis-Hall Iron Works* v. *Blair,* 57 App. D. C. 364; 23 F. (2d) 972, 974–5; *Hurwitz* v. *Commissioner,* 45 F. (2d) 780, 781; *Dickey* v. *Burnet,* 56 F. (2d) 917, 918.

of Turner's intention was that, throughout his extensive trading, 1,200 shares of United States Gas Improvement Co. stock were to remain in his account. Since this question was not considered in the court below nor argued here, the case must be remanded to the Court of Appeals for further consideration.

*Reversed.*

MR. JUSTICE STONE thinks that the judgment of the Court of Appeals should be reversed and the order of the Board of Tax Appeals affirmed, on the grounds that the petitioner failed to show that the particular shares sold were capable of identification with respect to the date of their purchase, and that they could not be identified merely by designating them to the broker as the shares to be sold.