CATHERINE LaBRUM, ET AL., EXECUTORS, ESTATE OF THOMAS J. FOLEY, DECEASED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 67217.    Promulgated April 7, 1936.

*George E. Beechwood, Esq.*, and *J. Harry LaBrum, Esq.*, for the petitioners.

*Dean P. Kimball, Esq.*, for the respondent.

### OPINION.

MURDOCK: The Commissioner determined the following deficiencies in the income tax of Thomas J. Foley, who is now deceased:

| | |
|---|---|
| 1927 | $706.93 |
| 1928 | 9,202.05 |
| 1929 | 13,555.50 |

The parties have entered into a stipulation which disposes of all of the issues raised in regard to the tax liability for the year 1927 and disposes also of a number of items affecting the tax liability for 1928 and 1929. The following assignments of error are left for decision by the Board:

1. The Commissioner has erroneously determined the cost of 650 shares United Gas Improvement Company common (old) sold for $95,487, in October and December 1928, as $63,747.50, whereas the correct cost basis is $84,243.75.

2. The Commissioner has erroneously included as income of the deceased taxpayer the following items in connection with deceased taxpayer's margin account with F. B. Keech & Co., for the calendar year 1929:

| | |
|---|---|
| Interest on credit balances | $102.99 |
| Dividends | 10,335.00 |
| Profit on 1797 U. G. I. old | 110,538.02 |
| Total | 120,976.01 |

for the reason that the alleged profits were not available to the deceased taxpayer in 1929 by reason of the taxpayer's account being held as collateral security for undermargined, guaranteed accounts deficient in the amount of $192,529.90.

3. The Commissioner has erroneously disallowed a deduction in the amount of $192,529.90 from income for the calendar year 1929, being loss by way of embezzlement or fraudulently obtained pledge of deceased taxpayer's securities to secure the account of Edward Foley with F. B. Keech & Co.

4. The Commissioner has failed to allow a deduction in the amount of $14,512.50 for the year 1929 covering embezzlement of the proceeds of 100 shares of United Gas and Improvement Company stock from decedent in 1929, which shares had a cost basis to decedent of $14,512.50.

The facts have been stipulated.

The following statement of the stipulated facts relating to the first issue will be sufficient for a decision of that issue. The decedent made the following purchases and sales of United Gas & Improvement Co. stock through Ware & Co.:

| Date | Shares purchased | Shares sold | Purchase price |
|---|---|---|---|
| Nov. 24, 1926 | 100 | | $9,220 |
| Dec. 8, 1926 | 500 | | 45,100 |
| Dec. 20, 1926 | 500 | | 44,600 |
| Mar. 28, 1927 | | 200 | |
| May 6, 1927 | | 200 | |
| June 28, 1927 | 200 | | 20,450 |
| Aug. 2, 1927 | | 200 | |
| Aug. 9, 1927 | 200 | | 22,050 |
| Aug. 25, 1927 | | 200 | |

Seven hundred shares of United Gas & Improvement Co. stock, representing the net balance in the above account, were delivered by Ware & Co., either directly to the decedent and, thereupon, by him to Hano, Wasserman & Co., or directly by Ware & Co. to Hano, Wasserman & Co. upon the decedent's order. The decedent at that time opened a new margin account with the latter firm and became indebted to the firm in the amount of $83,525.98. His indebtedness to Ware & Co. in this same amount was liquidated at that time. The decedent's account with Hano, Wasserman & Co. thereafter shows the following transactions in United Gas & Improvement Co. stock:

| Date | Shares purchased or received | Shares sold or delivered | Purchase price |
|---|---|---|---|
| Oct. 4, 1927 | 200 | | $22,850 |
| Oct. 6, 1927 | 200 | | 22,850 |
| Oct. 7, 1927 | 200 | | 22,450 |
| Feb. 15, 1928 | 1 250 | | |
| May 10, 1928 | 200 | | 28,987.50 |
| Sept. 24, 1928 | | 2 1,000 | |
| Sept. 28, 1928 | 100 | | 14,375 |
| Oct. 3, 1928 | 200 | | 28,025 |
| Oct. 8, 1928 | | 200 | |
| Oct. 10, 1928 | 200 | | 28,050 |
| Oct. 22, 1928 | | 350 | |
| Dec. 18, 1928 | 100 | | 15,200 |
| Dec. 24, 1928 | | 100 | |

1 Delivered by the decedent to the broker as collateral—cost and date of purchase not shown.
2 Certificates for these shares were delivered by the broker to the decedent. The record does not show what the decedent did with these shares, but they were not sold prior to the sale of the 650 shares.

The amount realized from the sale of 650 shares in 1928 was $95,487. Those shares "are incapable of identification." "The 1,000 shares [delivered to the decedent on September 24, 1928] can not be identified." The Commissioner determined that the cost of the 650 shares sold in 1928 was $63,747.50, which represented the cost of 300 shares purchased on December 20, 1926, 200 shares purchased on June 28, 1927, and 150 shares purchased on August 9, 1927.

The question for decision is the amount of gain which the decedent realized from the sales in 1928 of 650 shares of United Gas & Improvement Co. stock. The parties are in agreement as to the amount realized from those sales. They disagree as to the basis for computing the gain on the sales. They agree that the "first in, first out" rule must be applied in order to determine the cost basis of the 650 shares sold. It is apparent that the "first in, first out" rule must be applied since the parties have stipulated that the 650 shares sold are incapable of identification and since the decedent made no designation to his broker which might in any way serve to identify the shares sold with any particular lot or lots purchased. The so-called "first in, first out" rule is stated as follows in article 58 of Regulations 74:

ART. 58. *Sale of stock and rights.*—When shares of stock in a corporation are sold from different lots purchased at different dates and at different prices and the identity of the lots can not be determined, the stock sold shall be charged against the earliest purchases of such stock.

The 650 shares in question were sold from different lots purchased at different times and at different prices, and the identity of the lots can not be determined. Therefore the stock sold must be charged against the earliest purchases of such stock. The stipulation shows the cost to the decedent of the various lots of stock which he purchased. Apparently the 800 shares sold prior to the taxable year, while the decedent had his account with Ware & Co., were charged against the earliest purchases. Both parties accept that as a proper step. The Commissioner has charged the 650 shares sold in 1928 against the next earliest purchases which the decedent made. Thus he has done exactly what his rule requires and we are unable to find that there is any error in his computation.

The petitioner argues that the 1,000 shares delivered to the decedent by Hano, Wasserman & Co., on September 24, 1928, should be charged against and should absorb the cost of the remaining 700 shares purchased through Ware & Co. and the first 300 shares purchased through Hano, Wasserman & Co., and, therefore, the 650 shares thereafter sold should be charged against the cost of the next

650 shares purchased through Hano, Wasserman & Co. This argument would be sound if the decedent had sold the 1,000 shares which were delivered to him out of his brokerage account. It might also require some modification of the Commissioner's computation of the cost of the 650 shares if immediately after the delivery the account had contained less than 650 shares, because, in that event, it could be successfully argued that some of the 650 shares thereafter sold through that broker must, of necessity, have been shares acquired after September 24, 1928. However, it appears that the 1,000 shares delivered to the petitioner were not sold by him. Article 58 of Regulations 74, according to its terms, applies only to stock sold, and the petitioner, therefore, finds no support in the terms of the rule for her argument that the rule should be applied first to the stock which the decedent removed from this particular brokerage account. It further appears that on September 24, 1928, when the 1,000 shares were delivered to the petitioner, there were 1,750 shares in the account; after the 1,000 shares were removed, 750 shares remained; and it is entirely possible that the 650 shares later sold came from this remainder of 750 shares. The decedent made no designation as to which shares he was removing, and the stipulation is that the 1,000 shares can not be identified. Thus the facts of this case do not require that any cost be allocated to the 1,000 shares removed from the Hano, Wasserman account and held by the decedent. Nor is there any inconsistency in the Commissioner's determination that the 650 shares sold in 1928 should take the cost of the 650 shares purchased through Ware & Co.

The petitioner correctly states that on September 24, 1928, there were in the decedent's account with Hano, Wasserman & Co. the first 700 shares delivered into that account from Ware & Co. and also 800 shares subsequently purchased. But she fails to state and take into consideration the fact that at that time there were also 250 additional shares in the account which had been placed there by the decedent on February 15, 1928, as collateral. These 250 shares were not different from the other shares in the account and can not be distinguished or disregarded. The petitioner argues that the 1,000 shares delivered to the decedent on September 24, 1928, removed from the account the 700 shares originally purchased through Ware & Co. and 300 shares subsequently purchased through Hano, Wasserman & Co., and left in the account the 250 shares. She also assumes that the 650 shares later sold did not come from the 250 shares. But there is no reason to assume that the delivery of 1,000 shares removed from the account the 700 shares originally purchased through Ware & Co. Such an assumption would be inconsistent with the Commissioner's

determination. Since his determination is presumed to be correct, and since it is possible to assume that the 1,000 shares came from other than the 700 shares acquired through Ware & Co., there is in this record on this point no sound reason for rejecting the Commissioner's determination.

The petitioner cites the case of *J. T. Hedrick*, 24 B. T. A. 444, as authority for the proposition that when stock is taken out of a particular account for any purpose whatsoever, there must be allocated to it the cost of the earliest purchases of that stock in that particular account by reason of the "first in, first out" rule, and subsequent sales through that account take as a basis the next earliest costs which remain. The respondent attempts to distinguish that case and cites *W. A. Forrester*, 32 B. T. A. 745, as some authority for his action. The *Hedrick* case may be contrary to the later decision of the Supreme Court in *Helvering* v. *Rankin*, 295 U. S. 123. It was decided on its own facts without the benefit of the later decision of the Supreme Court in the *Rankin* case. If it still stands as authority for any proposition that is contrary to the views herein expressed, then to that extent it must be disregarded, for here the Commissioner correctly applied the "first in, first out" rule to the facts as stated.

The three remaining assignments of error in the determination of the deficiency for the year 1929 are more or less related. All of the stipulated facts have, of course, been considered, but only such facts will be stated as are necessary for understanding the questions involved. The decedent, prior to January 11, 1929, had controlled and directed the transactions in a margin account carried with Hano, Wasserman & Co. in the name of Charles F. Foley. He had a son named Charles F. Foley. The son was employed by F. B. Keech & Co. as a customer's man, from January 1929 until October 9, 1930. The decedent on or about January 11, 1929, opened a margin account in his own name with F. B. Keech & Co., stockbrokers, and on the same day he ordered that the Charles F. Foley account be transferred from Hano, Wasserman & Co. to F. B. Keech & Co. His order in regard to the transfer of the Charles F. Foley account was not carried out but, instead, contrary to his directions, the account was opened with F. B. Keech & Co. in the name of Edward Foley, a fictitious name. This account was owned and managed by Charles F. Foley. The decedent at that time was about seventy-four years of age, was extremely illiterate, and was unable to read or write anything except his own name. The decedent, on January 10, 1929, signed a letter addressed to F. B. Keech & Co., the body of which was as follows:

I beg to advise you that any security I may have on deposit with your company can be used by you as collateral and security for the accounts of Mrs. Ellen Kerrigan, Mrs. Catherine LaBrum and Edward F. Foley.

The name "Edward F. Foley" was added to the above letter without the knowledge or consent of the decedent.

The decedent signed a letter on October 9, 1930, addressed to F. B. Keech & Co., the body of which is as follows:

I hereby authorize you to open a Guarantee Account under my name to be known as the T. J. Foley Guarantee Account; for the purpose of guaranteeing the accounts carried in this office of:

Kathryn La Brum
Ellen Kerrigan
Edward Foley
Thomas J. Foley, Jr.
F. H. Foley

I further authorize you to withdraw collateral funds from the T. J. Foley Account at any time and transfer them to the T. J. Foley Guarantee Account to take care of the debits in any of these accounts mentioned above that I am guaranteeing.

I will also continue to guarantee the accounts named above with my regular account carried in your office, and known as the T. J. Foley Account, Philadelphia #258.

The decedent received a letter from F. B. Keech & Co. on October 11, 1930, dated the previous day, stating:

At the close of market today your account needs $80,500.00 to meet our marginal requirements. Kindly let us have your check to cover this amount by return mail.

The sole reason for the call for additional margin was that F. B. Keech & Co. believed that the transactions made in the Edward Foley account, which had resulted in losses of $292,000, were duly authorized by the decedent. It was the first claim for additional security ever made in connection with the accounts. The decedent learned of the irregularities for the first time as a result of having received that notice.

The decedent filed a bill of complaint on October 13, 1930, and thereafter temporary restraining orders were issued against F. B. Keech & Co. restraining it from disposing or attempting to dispose of any securities or collateral pledged in the personal account of Thomas J. Foley, Sr., the accounts of Catherine LaBrum, Ellen Kerrigan, Thomas J. Foley, Jr., Florance H. Foley, and Edward Foley pending hearing and disposition of an application for a preliminary injunction. One proceeding was instituted in the state court and one was instituted in the Federal court. The contentions of the decedent and of his representatives after his death in the suits which were brought were, in general, that William A. Quigley, the manager in charge of the Philadelphia office of F. B. Keech & Co., and Charles F. Foley had made transactions in the Edward Foley account without the knowledge, consent, or approval of

Thomas J. Foley, had used the collateral pledged in the latter's name as security therefor, and had concealed the transactions from Thomas J. Foley; they had caused the name of Edward Foley to be included in the letter of January 10, 1929, with the intent to make Thomas J. Foley personally liable for any losses sustained in that account; they had wrongfully withdrawn money from that account; they procured the execution by Thomas J. Foley of the letter dated October 9, 1930, purporting to contain a guarantee of the Edward Foley account by misrepresenting to Thomas J. Foley that it related only to other accounts which he intended to guarantee; and, as a result of their actions, the Edward Foley account on the books of the partnership showed debit balances ranging from a low of about $59,000 at the end of February 1929 to a high of about $614,000 at the end of July 1929, from a low of about $201,000 on January 31, 1930, to a high of about $405,000 on June 30, 1930, and, finally, a debit balance of about $312,000 on October 10, 1930, with securities worth about $40,000 pledged as collateral. The partners of F. B. Keech & Co., in the proceedings brought against them, denied any knowledge of or responsibility for the unlawful acts of Quigley and Charles F. Foley, and contended that Charles F. Foley was fully authorized to trade and deal in the account in the name of Edward Foley. The suit in the United States District Court was dismissed on April 13, 1931, for lack of jurisdiction. Thomas J. Foley died on January 10, 1932. The suit in the Common Pleas Court of Philadelphia was settled by the parties on September 1, 1932, before trial.

The settlement provided, among other things, that Keech & Co. would deliver to the estate of Thomas J. Foley 6,100 shares of United Gas & Improvement Co. common stock, together with a dividend thereon payable to stockholders of record on August 31, 1932, and was to retain as its own property 10,796 shares of United Gas & Improvement Co. stock as well as all other securities in the six accounts, after canceling all debit balances in those accounts. The estate of Thomas J. Foley received on September 1, 1932, from F. B. Keech & Co., in settlement of the suits, 6,100 shares of United Gas & Improvement Co. stock of the total value at that time of $124,287.50, and $1,830 in cash representing the dividends on the stock. F. B. Keech & Co. recovered from a surety company on a fidelity bond insuring it against loss due to the fraud of William A. Quigley, Philadelphia manager, in connection with the Edward F. Foley account.

The record contains a photostatic copy of the decedent's account and also of the Edward Foley account with F. B. Keech & Co. for

1929. Drafts for a total amount of over $250,000 were debited to the decedent's account at various times during 1929. The total debit balances in accounts with F. B. Keech & Co., other than the Edward Foley account for which the decedent's securities were a guarantee, amounted to approximately $222,000 as of October 9, 1930, while the collateral in the accounts, including the decedent's own account, was worth approximately $555,000.

The decedent filed his income tax returns for 1928 and 1929 with the collector of internal revenue for the first district of Pennsylvania, at Philadelphia, Pennsylvania. They were on the basis of cash receipts and disbursements. The petitioner concedes that the decedent realized gains or other income through his account with F. B. Keech & Co. in 1929, as determined by the Commissioner, unless the facts and circumstances related herein operate to eliminate or reduce the income or to create a deductible loss or other allowable deduction. The Commissioner in determining the deficiency added to the decedent's income for 1929, as reported on his return, $102.99 as interest received through F. B. Keech & Co., $10,335 as dividends received through F. B. Keech & Co., $9,665.06 as "additional profit" "The United Gas Improvement Company", and $86,146.08 as capital net gain on the sales of rights and various kinds of shares of the stock of "The United Gas Improvement Co." He also increased the deduction of $6,000 claimed on the return for interest to $18,576.73, which included $5,225.24 of interest paid to F. B. Keech & Co.

It should be borne in mind that the three remaining issues relate to the year 1929 and that the year 1930 is not before the Board. The petitioner contends that "by reason of larceny, embezzlement, fraud and trickery there were no profits or income available to the decedent from his transactions in his account with F. B. Keech & Company during the calendar year 1929." The Commissioner has determined that the decedent received certain income in 1929 through his account with F. B. Keech & Co. An examination of the account shows that the interest, dividends, and proceeds from the sales of United Gas & Improvement Co. stock were credited to the decedent in this account at various dates during the year 1929. The account also shows that drafts on the account were honored and charged at various times during the year 1929. The total amount withdrawn from the account through drafts exceeded $250,000. The fact that these drafts were drawn and honored indicates clearly that the decedent was not only free to withdraw cash from his account, but he actually did withdraw cash far in excess of the total of the items in controversy. Furthermore, the account at most times during the year showed a

debit balance, and the credits for interest, dividends, and proceeds of sales served to reduce the debit balance and immediately benefited the decedent. The wrongful acts of Charles F. Foley and Quigley did not prevent the decedent from realizing the income in question from his own separate account with F. B. Keech & Co. Thus, there is obviously no merit whatever in the petitioner's argument that the decedent did not constructively receive all of the amounts credited to his account during the year 1929, and the Commissioner did not err in including the items in question in the decedent's income for 1929.

This point probably deserves no further discussion. However, it is a fact that the letter of January 10, 1929, is the only document executed by the decedent in 1929 which might have made F. B. Keech & Co. think that any property of the decedent could be held in connection with the Edward Foley account. Not only was the insertion in that document of the name "Edward F. Foley" a fraud upon the decedent, but the document itself merely provides "that any security I may have on deposit with your company can be used by you as collateral and security for the accounts." "Any security" may perhaps refer to bonds and shares and not to amounts credited to the decedent's account as interest, dividends, or proceeds of sales. But in any event, that document in no way prevented the decedent from realizing income through his account from interest, dividends, and sales. In so far as the document served to pledge the decedent's securities as collateral and security for the accounts of his two daughters, that is, Mrs. Kerrigan and Mrs. LaBrum, it evidenced a voluntary act upon his part which did not serve to prevent him from realizing income through his own account. These circumstances further demonstrate that there is no merit in the petitioner's contention that the Commissioner erred in including in the decedent's income the items in question.

The petitioner next argues for "a deduction for 1929 in the amount of $192,529.90 on account of losses arising from theft, larceny, embezzlement, or fraudulent misappropriation of decedent's securities and the unlawful pledging of them as collateral in the fictitious marginal account with F. B. Keech & Company in the name of 'Edward Foley.'" The figure of $192,529.90 is shown only in Exhibit I. The stipulation states that that exhibit is a "copy of letter from Harriman & Keech dated March 8, 1935, showing the status of the account carried in the name of Edward Foley as of December 31, 1929." The letter is on the stationery of Harriman & Keech and is signed "F. B. KEECH & Co. IN LIQUIDATION" by an auditor. It contains the following statement relating to the Edward Foley account:

The status of the account of Edward Foley on December 31, 1929 was as follows:

| | | |
|---|---|---:|
| 300 | Tobacco Products, 2½ | $750.00 |
| 100 | Lehigh Coal & Nav., 105 | 10,500.00 |
| 300 | Pennroad, 13½ | 4,050.00 |
| 600 | Indian Terr Oil, 19½ | 11,700.00 |
| | Market Value | 27,000.00 |
| | Debit Balance | 212,217.90 |
| | | 185,217.90 |
| | Margin Reqt | 7,312.00 |
| | Under Margin | 192,529.90 |

The above is figured at 25% margin requirement, except on 300 Tobacco Products.

Apparently the petitioner's argument is that the decedent had a loss of $192,529.90 because the Edward Foley account at the end of the year 1929 was undermargined by that amount. The stipulation clearly shows that some dishonest acts were committed and that advantage was taken of the decedent, but it does not show that he sustained a loss in 1929 of $192,529.90. If the Edward Foley account had been closed out at the end of 1929, and if the securities of the decedent in his own account could have been lawfully taken by F. B. Keech & Co. to cancel that debit balance, the decedent's loss would not have exceeded $185,217.90. But, as a matter of fact, the Edward Foley account was not closed out at the end of 1929. No securities of the decedent were taken at that time to pay the debit balance in the Edward Foley account, and the decedent sustained no loss in 1929.

The pertinent provision of the Revenue Act of 1928 is section 23 (e) (3), which allows an individual a deduction for "losses sustained during the taxable year and not compensated for by insurance or otherwise * * * of property not connected with the trade or business, if the loss arises * * * from theft." The respondent concedes that a loss from embezzlement would be deductible under the above quoted provision. Furthermore, if property is stolen in 1929, the loss is deductible in that year even though the owner of the property is not aware of the fact that it has been stolen and that he has thereby suffered loss. Nevertheless no part of the loss which the decedent has apparently sustained as a result of the alleged unlawful acts of Quigley and Charles F. Foley, and the transactions which they made through the Edward Foley account, was sustained by the decedent in 1929. The fraudulent addition of the name of Edward F. Foley to the letter of January 10, 1929, did not occasion the decedent any immediate loss. The fraud, embezzlement, or whatever it may properly be called, which

was being perpetrated through the Edward Foley account, was incomplete at the end of 1929 and remained incomplete until the decedent put a stop to it in October 1930. The Edward Foley account was still an open account at the end of 1929. It is not the petitioner's contention that the Edward Foley account was the decedent's account, therefore his loss did not occur at the time that any particular transaction in that account was closed at a loss. Instead, the petitioner's contention is that the decedent's loss is represented by the liability of his securities as collateral and security for the Edward Foley account as a result of the letter of January 10, 1929. Since that letter was a fraud upon the decedent, it is at least doubtful whether the securities in his account could lawfully be used as collateral and security for the Edward Foley account. F. B. Keech & Co., of course, claimed that they could, but the decedent never admitted that they could, and their differences were settled without that point ever having been decided. The terms of the settlement have been set forth in the stipulation, but they do not indicate to what extent the claims of the various parties were sustained. F. B. Keech & Co. was required to cancel all debit balances in the various accounts and was required to surrender shares and cash worth about $126,000, but it was permitted to retain all other securities in the six accounts. Was the decedent's ultimate loss "compensated for" in that settlement? Before the amount of a deductible loss for any year could be determined, the amount of the compensation, if any, which was ultimately received would have to be determined and deducted. This would present an insurmountable practical difficulty to the computation of a deduction for 1929, even if there had been a loss for 1929. But at best for the petitioner, the situation at the close of 1929 was that the securities in the decedent's account were being held as collateral and security for the deficit in the Edward Foley account. It might have appeared at that time that the decedent was likely to suffer a loss of some amount, then unknown, because F. B. Keech & Co. might sell some of his securities. But, as a matter of fact, it had neither taken nor sold any of his securities and, consequently, he suffered no loss in 1929. There was also at the close of 1929 the possibility that he might eventually sustain no loss, since the deficit in the Edward Foley account might subsequently be wiped out, or reduced, by profitable transactions or by an increase in the value of the securities belonging to the account. Losses to be deductible under the statute must be sustained. No deduction is allowed for anticipated losses even though they may appear to be imminent.

The decedent, on January 17, 1929, transferred 100 shares of United Gas & Improvement Co. stock to F. B. Keech & Co. for use as collateral for the account in the name of Charles F. Foley. The

decedent had purchased these shares on May 10, 1928, at a cost of $14,512.50. This stock, contrary to his instructions, was placed in the Edward Foley account and was sold on January 28, 1929, for $17,673. The proceeds of the sale were credited to the Edward Foley account. The petitioner claims a deduction of $14,512.50, representing a loss on this stock in 1929, but concedes that any deduction allowed in this connection would reduce the amount of the loss claimed in the preceding assignment of error.

If there had been an account in the name of Charles F. Foley, and if the shares had been sold in that account, the decedent might not be entitled to any deduction for loss. Cf. *J. Edgar Davidson et al., Executors*, 26 B. T. A. 754. But there was no Charles F. Foley account and the shares were diverted to and sold in the Edward Foley account. The stipulation is that this account was owned and run by Charles F. Foley for his own benefit. The decedent did not intend to give the shares to his son nor did he intend that they should be sold and the proceeds retained by his son. The evidence establishes a loss which is deductible under section 23 (e) (3) to the extent that it is not compensated for by insurance or otherwise. The fair inference from the entire stipulation is that the decedent was not compensated for his loss by insurance or otherwise. The Commissioner erred in not allowing the deduction claimed in the amount of $14,512.50.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

SMITH and MATTHEWS dissent.