MONTROSE CEMETERY CO. v. COMMISSIONER OF INTERNAL REVENUE.
No. 6811.

Circuit Court of Appeals, Seventh Circuit.
June 21, 1939.

Cecil C. Erickson, of Chicago, Ill., and John L. Laskey, of Washington, D. C., for petitioner.

James W. Morris, Asst. Atty. Gen., and Sewall Key and Howard P. Locke, Sp. Assts. to Atty. Gen., for respondent.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

This petition for review involves income taxes imposed upon gains made in 1931 from the sale of burial space. The cemetery lots sold in 1931 had been acquired prior to 1913 at a cost admittedly less than the fair market value thereof on March 1, 1913, and the controversy here is over the proper value of the unadjusted basis to be used in determining the recognized gain in 1931.

The Commissioner of Internal Revenue (hereinafter referred to as the "Commissioner") fixed the value at 21.5 cents per square foot. The taxpayer (hereinafter also referred to as "Montrose") appealed to the United States Board of Tax Appeals (hereinafter referred to as the "Board"), which determined the value at 23 cents per square foot.

In 1902 one Kircher, Chicago undertaker, founded the Montrose Cemetery Company and for 18 years until his death in 1920 personally managed and controlled its operations. In 1902 Kircher purchased an 80.02 acre tract of land in the northwest part of the city of Chicago for the sum of $75,000, which he immediately transferred to Montrose in exchange for its entire capital stock of $300,000. In 1912 Montrose purchased an adjacent tract of 19.485 acres for $23,500 and a 20-acre tract in 1918 for $20,000.

The last two tracts of land are not considered in this case, because as yet they have not been dedicated to cemetery purposes. However, it should be noted that the acquisition values of these tracts did not vary very much. In this connection, the Bohemian National Cemetery, across the street from the Montrose Cemetery, acquired 60.125 acres in 1902 for $60,000 and refused to buy 60 acres in 1910 for $55,000. The evidence indicates that during all these years the value of land unimproved for cemetery purposes was around $1,200 an acre or 2.75 cents a square foot.

By March 1, 1913 Montrose had made capital expenditures in the sum of $77,196.-88 for buildings, furniture and fixtures, horses, wagons, and tools. These additional capital assets were indispensable to the operation of the cemetery, and enabled it to compete with the other 39 cemeteries in the Chicago area. This, of course, facilitated the sale and increased the value of the unsold graves, Montrose's main asset, mostly unrealizable on March 1, 1913.

This unrealizable asset on the basic date consisted of an available net area of 2,214,786 square feet of burial grounds. Of this area 932,466 square feet were in improved sections, the improvement cost of which is not disclosed by the record, and 1,282,320 square feet were to be found in unimproved sections. It is important to add that, of the 14,993.67 square feet of burial space sold in 1931, 4,498.10 square feet were from the improved area in 1913 and 10,495.57 were from the unimproved area in 1913.

On the valuation date 932,466 square feet of burial space were improved, but the record failed to reveal the cost of improvement. The record, however, does disclose figures as to the subsequent improvements of the unimproved area in 1913. Montrose made sales of space from land unimproved in 1913 after having expended only about 8 cents per square foot for improvements thereto. From 1913 to 1931 4.99 cents per square foot was expended, and counsel for Montrose uses this figure in his brief, to improve the land unimproved as of March 1, 1913 to saleable condition in 1931. In addition, subsequent improvements costing 3.1 cents were made, which benefited the area improved and unimproved at the basic date. In this connection, Buswell, President of Montrose since 1928, testified that 25 cents per square foot would meet the total cost of improving and maintaining the entire cemetery throughout its entire life, starting from the raw land, grading out roads, putting in sewers, making tile and water lines, and providing for a reasonable amount of work on trees, shrubbery and lawns. Lightfoot, called by the Commissioner, was even more conservative, stating that in his opinion the cost of improving each square foot of acreage from raw land to a saleable condition and maintenance thereof to the day of the sale of the last grave was 30 to 35 cents.

We are mindful that development and maintenance go on over the entire life of a cemetery, so that on any given date, e. g., say March 1, 1913, it is safe to conclude that the total 25 cents had not been expended as to every square foot of area. In fact, some of the footage might have been improved and sold at a lower figure than 25 cents. For instance, to take the 10,-495.57 square feet of burial space here in question, unimproved in 1913 but saleable and sold in 1931, the record reveals that the conversion cost from raw land to saleable land was 4.99 cents per square foot. Yet, it might be said that upon the final accounting, when the last grave has been sold, the total cost of improvement spread equally over every square foot of the cemetery would come to 25 cents or 30 to 35 cents.

Around 1913 statistics in the record indicated that in the future Montrose could hope to sell approximately 31,000 square feet of burial ground each year. It was then competing favorably with 39 other cemeteries in the city, the population was increasing, and it was accessible to the public by city street car lines. In the basic year burial space in general sold for 88.2 cents per square foot. In particular, lots and select graves sold between $1 and $1.13 per square foot, and sales of common graves occurred at 52.95 cents per square foot. In 1904, in comparison, the retail sale prices were 33.07 cents, 32.45 cents to 93.75 cents, and 47.55 cents, respectively. On the other hand, in 1931, retail sale prices were $2.49, $2.41 to $2.60, and $1.31, respectively.

According to Buswell, the fair market retail sale prices on the basic date, in his opinion, included the 2.75 cents given above as cost of the raw land, the 25 cents as cost of the entire improvement and maintenance of the cemetery, and a profit.

Schrade, called by Montrose, thinking the same way, stated that the retail sale prices reflected various adjustments such as those made for land costs, ratable distribution of operating cost, discounts for time required to sell the graves, and a profit.

Buswell and Schrade based their fair market value opinions on the retail sales prior to and during the basic year of 1913. Yet, since Montrose sold burial space to ultimate users only, and not for speculation, it is clear that in 1913, and Buswell and Schrade so admitted, there was in fact no retail market for the balance of the footage then available and unsold. It is undisputed that many years would pass before the lots could be sold. In fact, the burial space in question, although available in 1913, was not in public demand until 1931. In 1913, as in any given year, the demand for cemetery lots was limited by actual deaths and prospective deaths in the community.

In addition to selling burial space, Montrose performed various incidental services in 1913, from which income was derived. Such services consisted inter alia of providing perpetual care for graves, making cremations and interments, setting all foundations for stone work, selling plants and shrubbery, and renting the use of the chapel. Prior to 1913, excepting the year 1910, the income from these sources surpassed the expenses, and in 1913 the income margin was $3,846.07. Moreover, in 1913, the net income of the cemetery was $31,902.48. A prospective buyer at this time could reasonably have expected future earnings around $30,000 annually.

It should be noted in passing that if an income of $30,000 is capitalized at 5 per cent, a present valuation of $600,000, based on prospective net earnings, is reached. This valuation is equivalent to a square foot value of about 27 cents. Buswell and Schrade for the taxpayer testified that the fair market value was over $2,000,000 or over $1 per square foot. Applying the 5 per cent return on capital invested, we see that an investment of $2,000,000 should receive over $100,000 income annually, which is grossly out of line with the $30,000 annual income a prospective buyer of the cemetery could expect.

In its tax return for 1931, Montrose used an unadjusted basis of approximately $1.89 per square foot. That is, it valued the footage sold in 1931 at $28,381.66. It determined that lots were worth $2 per square foot, select graves $1, and single graves around 49 cents. These values had been used by it in its tax returns for the years 1917 through 1921.

It should be noted that in the early income tax returns a basis of 8.58 cents per square foot was used. Moreover, about 1920 Montrose had three retrospective appraisals made as of 1913 for tax purposes. Each appraiser gave as his opinion that the fair market value on March 1, 1913 was 15 cents per square foot for unimproved land and 25 cents for improved land. Furthermore, in its capital stock tax returns from 1916 to 1924 the taxpayer reported the fair value of its land at a high of $316,048.95, justifying these reports on the logical ground that the total unearned profit on future sales of unsold cemetery land on March 1, 1913 was an unrealizable asset at that time, realizable only "through the sale of lots at retail extending over a period of upwards of 50 years."

The Commissioner refused to accept Montrose's tax figures and in his deficiency assessment determined that the entire cemetery land had a fair market value of 21.5 cents per square foot on March 1, 1913. Montrose appealed to the Board and contended for a value of 94 cents per square foot, using a weighted average value which placed separate weight on the improved and unimproved footage.

Montrose's opinion witnesses testified that the fair market value of the net saleable land in the cemetery was over $2,000,000 or between $1 and $1.66 per square foot. Buswell, who had no personal knowledge of the physical condition of the cemetery in 1913, did not place separate values on the improved and unimproved acreage. Schrade, who was familiar with the unsold acreage in 1913, stated the improved portion was worth between $1 and $1.66, and the unimproved portion 75 cents. These opinions measured the value of the unsold land in 1913 by retail sales of land sold prior to and during 1913.

Commissioner's three opinion witnesses were not familiar with the cemetery in question in 1913. Thomas gave a value of $235,000 for all of Montrose's assets without placing separate values thereon. Richards testified to a value of $334,691 or 15.1 cents per square foot, and Lockwood a value of $332,000 or 15 cents per square foot. These opinions measured the value of the unsold land in 1913 by an analysis

of sales, expenses, earnings, and related matters.

[1] Upon this evidence, the Board made its finding that the fair market value of the footage in question was $3,448.54 or 23 cents per square foot. Montrose now contends inter alia that the Board erred in its determination, because it did not follow the command of Elmhurst Cemetery Co. v. Commissioner, 300 U.S. 37, 57 S. Ct. 324, 81 L.Ed. 491, which, it is claimed, compels the application of an exclusive method for determining the fair market value in cemetery cases, namely, that retail sales of burial space sold prior to or during the basic year of 1913 are conclusive evidence of the value of the burial space unsold and available in that year. With this contention we are unable to agree, as all factors having to do with the determination of values must be considered. All the factors must be weighed in the light of the other facts developed and be given only such weight as may seem just and reasonable.

Before specifically considering Montrose's assignment of errors, it would be proper to describe what methods of determining value were actually used.[1] The Commissioner, Richards, and Lockwood valued the unsold lots and graves in 1913 on the present-value method using Hoskold's formula with interest rate at 4 per cent and risk rate at 8 per cent. In accord with the present-value method, the average selling price to be received for the unsold land (based on the retail prices of the sold land) and the time required to sell the unsold land are first anticipated. The unsold land multiplied by the average price per square foot then gives the total expected amount to be received for the unsold land over the period of time in question (the expected life of the cemetery). This unrealized amount is then discounted to present value by the use of Hoskold's formula. In addition, Lockwood also applied the reproductive appraisal method or the cost of reproducing the cemetery as it was on March 1, 1913.

Montrose's contentions and the opinions of its witnesses measure the fair market value of the unsold lots and graves in 1913 by the retail sale of lots and graves

sold on or about the basic date. In fact, it is insisted that the Elmhurst case makes retail sales the sole determinator of value. The Commissioner, on the other hand, refuses to accept retail sales except insofar as they are used in estimating the anticipated selling price of the unsold lots, and insists that the only comparable sale which could be used as a measure of the value of the unsold cemetery land would be the sale of an entire cemetery similar to the one in question. In summary, what we have here is simply this: Montrose makes the selling price the determinator of value; the Commissioner makes the selling price, less discount for years required to realize the selling price, the determinator of value.

The Board criticized each side, in effect stating that the use of the present-value method alone, or the use of retail sales alone, is not justified. The Board acted on all the evidence furnished to it and its decision indicates, and we believe correctly, that value after all is a question of fact to be determined from all the evidence. In answer to Montrose, the Board reasoned, and we believe its logic is indisputable, that the Supreme Court of the United States did not sanction, nor did it prescribe, any exclusive method for determining fair market value in cemetery cases. To us it is elementary that to confer conclusiveness upon evidence of retail sales in cemetery cases is to invade unnecessarily the field of administrative autonomy.

The fair market value is a price at which a willing seller and a willing buyer will trade, both having a reasonable knowledge of the facts. In ascertaining any particular value, the purpose for which the valuation is made is controlling. In the instant case the purpose of the valuation is to provide Montrose and the Commissioner with a substitute tax basis, so that gain or loss on sales of cemetery lots after 1913 can be determined.

Ordinarily, the cost of the entire cemetery when acquired is the unadjusted tax basis used in the determination of gain or loss from sales of burial space therein. Here the cemetery property was acquired prior to 1913, at a cost less than the fair market value thereof on March 1, 1913. In such a case the fair market value on

---

[1] The methods used by Montrose and Commissioner did not fail to give due weight to the fact that on March 1, 1913, the unsold land was in improved and unimproved sections. The methods used treated all the unsold land as improved, and deducted a certain cost per square foot as the cost necessary to bring the unimproved area up to the same state of improvement as the improved area.

March 1, 1913 is made the statutory substitute in place of the usual cost basis. Such a valuation manifestly does not contemplate a sale in 1913 to a buyer who intended to use the burial space himself.

Plainly, if Montrose had purchased the cemetery on March 1, 1913 for 2.75 cents per square foot, the unadjusted basis for the cemetery space sold in 1931 would have been 2.75 cents per square foot and not the price of retail sales of comparable and similar burial ground in 1913. Therefore, since the valuation here is to find a tax basis in place of the usual cost basis, the task is as follows: the Board has the job of determining what Montrose, who intends to sell after 1913, would reasonably pay for the burial space of 14,993.67 square feet in question, or the entire cemetery for that matter, as it stood on March 1, 1913.

■ Obviously no buyer would have purchased either the particular footage in question, or the entire cemetery in 1913, at the retail price per square foot at which cemetery space was selling prior to and during 1913. He would reasonably foresee that one must wait many years for a return of his money and would therefore offer less. Cemetery space can not be used for any other purpose than for burial, and the demand for space is limited by actual deaths and prospective deaths in the community. In other words, the supply of available cemetery space being greater than the demand in the Chicago area, the situation is one of restricted, rather than general, market.

It is for this reason that the price of retail sales, ordinarily the best evidence of value in situations commanding a general market, can not be accepted as satisfactory. Counsel for Montrose would have us go further. He insists that the Elmhurst case, supra, compels the Board to accept the retail price as the sole determinator of value. We have shown that the circumstances of this cemetery case make the retail price as evidence of value unsatisfactory, unless a discounting is provided for the time element, the period of holding before a market can be had.

The weakness of the price of retail sales is obvious from facts and circumstances other than those already shown. The cost of acquiring the raw land in 1902 was around 2.75 cents a square foot. Montrose set a value in 1913 of 94 cents a square foot. Stated in another way, the land cost $75,000 in 1902, and in 1913 a value of over $2,000,000 was claimed. The particular footage involved, i. e., 14,993.-67 square feet, cost $412.23 in 1902. In 1913 a value of $14,097.47 is asserted, such value being based exclusively on the price of retail sales prior to and during 1913.

The extraordinary rise must have been due solely to the change in its use from raw land to cemetery land, for the record shows that the value of raw land remained constant from 1902 to 1913. This difference between the cost of 2.75 cents and the claimed value of 94 cents seems inconsistent with testimony of Montrose's witnesses that set 25 cents a square foot as the conversion cost from raw land to saleable cemetery land. On this testimony the value in 1913, all other things being equal, might be closer to 27.75 cents per square foot than to 94 cents per square foot.

■ Comparing Montrose's and Commissioner's method of determining fair market value, it would seem that Montrose's undiscounted selling price is less equitable and less indicative of value than the Commissioner's discounted selling price. The value in 1913 of a cemetery lot might very well be 94 cents per square foot to a user in 1913, but the value of that same lot in 1913 to Montrose, who intended to sell that lot to a user in the future, was not an undiscounted 94 cents per square foot. To us it follows that the undiscounted retail price is not satisfactory, and surely not conclusive, evidence of the fair market value.

This does not mean to imply, however, that the discounted retail price of cemetery space sold prior to or at the basic date is conclusive evidence of the value of the balance of cemetery space unsold on the basic date. Value at any particular time is a fact. This fact is deduced from the application of judgment and discretion to a great many other facts and circumstances, and, as values are fluctuating and changeable, it is not easy to lay down a general and satisfactory rule applicable in all cases. For this reason any contention that a particular evidence is conclusive of value can not stand. The value reached will never be more than an approximation, but it should reflect the Board's application of its judgment to all the facts of the particular case.

It is also insisted that the Board did not apply a "correct principle of law to the facts found," and the argument is made that the "correct principle of law to the

facts found" involves a determination based on retail sales, with counsel stating that the Board did not explain the "principle of law" used, as it did "in detail" in the Elmhurst case. We have given this contention considerable thought. We are convinced that the Board's decision is "in accordance with law," Title 26 U.S.C.A. § 641(c)(1), and that the Board did apply the correct rule of law to the facts found, Helvering v. Rankin, 295 U.S. 123, 131, 55 S.Ct. 732, 79 L.Ed. 1343.

In its Elmhurst decision, the Board briefly stated that the taxpayer's valuation, which was based on the retail sales price, was "reasonable and should be allowed," adding that this price was substantial evidence of the fair market value. In the Board's present decision, it refused to accept any particular evidence as conclusive. In essence, the Board in this case considered all the evidence submitted and all the methods of valuation advocated by the witnesses, and then commented on this evidence and on the methods used. If its decision means anything, it means that the Board weighed all the evidence, and that it viewed the methods of valuation used by the witnesses as guides or checks on its judgment and discretion, in determining the fair market value on March 1, 1913.

■ Retail sales constitute only one element to be taken into consideration in the determination of the fair market value of the cemetery land, and the use of the retail price method alone is not justified. The same consideration is applicable to the element of time required to sell the cemetery land and the present-value method which is based thereon. Along with the time element and the retail selling price there should be taken into consideration the cost of acquisition of the cemetery, the location, age, size and topography, the state of development, the existence of competing cemeteries, the type of clientele, the trend of population served, annual net earnings, and other related matters. Consideration of all the evidence bearing on the value is compliance with the law. The Board in its decision clearly indicated, and the Board is correct, that value at any particular time is a fact which can only be deduced properly by judging and weighing all the pertinent evidence in the case.

■ We believe also that the Board's finding of 23 cents as the value per square foot meets the substantial evidence test. Although we might have found a different value had we been judge and weigher of the facts, this is not the test. Since the determination of value involves a question of discretion, and the exact value is not in the evidence of the case, we can appreciate that no two judges of the same facts would agree. At any rate, mathematical precision is impossible and it is gospel that the value reached can never be more than an approximation. We, of course, are bound by the rule that where there is substantial evidence to support the Board's finding upon a question of fact, its decision of such a question is conclusive upon review. Elmhurst Cemetery Co. v. Commissioner, supra; Palmer v. Commissioner, 302 U.S. 63, 70, 58 S.Ct. 67, 82 L.Ed. 50; Helvering v. National Grocery Co., 304 U.S. 282, 294, 58 S.Ct. 932, 82 L.Ed. 1346.

That there is substantial evidence to support the administrative finding can not be disputed. The record clearly points to a value between 15 cents and 30 cents per square foot. All methods of valuation described and used in the record, except Montrose's undiscounted sales method, indicate values ranging from 15 cents to 30 cents. Thus, the present-value method gave a value of 15 cents, and it is to be noted that some consideration was given to retail sales. The reproductive appraisal also indicated a value of 15 cents, and capitalizing net earnings in 1912 or 1913 at 5 per cent would have given a value between 25 cents and 30 cents.

There were other facts and circumstances pointing to the same result. For instance, the original transaction, in which the raw land worth $75,000 was exchanged for the capital stock at $300,000, gave a value increment over cost of $225,000 at once. In addition, the capital stock returns showed a value below 20 cents, and the letters to the Commissioner, containing three retrospective appraisals, valued the unimproved land at 15 cents and the improved land at 25 cents. This brief review of the evidence, which is adequately described in the statement of facts above, leads to the conclusion that the Board's finding of 23 cents per square foot is adequately supported by the evidence.

■ Counsel for Montrose presses the argument that the "issue here is the March 1, 1913 fair market value of the 14,993.67 square feet of land sold in 1931 and not the fair market value of the balance of the cemetery land amounting to 2,214,786 square feet on hand March 1, 1913." We

do not disagree, yet we fail to see why he raises this contention. As we have read the record, the basis applicable to the space sold in 1931 was found. The evidence by both sides was directed toward the ascertainment of the tax basis of the land sold in 1931, and the Board acted on this evidence.

Let us assume that the cemetery was acquired on March 1, 1913. Then the acquisition cost would be allocated properly to portions of the cemetery land sold in subsequent sales. Since in the instant case we are seeking a tax basis in place of the usual cost basis described in the hypothetical case, we are under the impression that the same treatment should be accorded in both cases. Montrose does not suffer injury if in the instant case the basis for the total unsold acreage is first found and allocation made later as sales therefrom are made.

Moreover, the total of the bases for all of the separate sales of burial space can not exceed the value of the unsold land in 1913. It would seem immaterial, therefore, whether the basis applicable to the footage sold in 1931 was determined directly, or whether the value of the entire unsold land in 1913 was first determined and then an allocation made to the space sold in 1931. The basis does not vary, no matter which way is used.

One other contention requires consideration. Counsel for Montrose says, "We have read and reread the decision of the Board * * * but we can not figure out from its decision how it arrived at $0.23 * * *. We maintain that from the evidence in this record the only findings that the Board could make were $0.15 per square foot, $0.94 per square foot or $0.9987 per square foot and nothing else because those valuations were the only valuations that the Board had before it * * *." In effect, this argument is another form of the broader contention that the Board applied an incorrect principle of law in arriving at its decision.

■ We have already answered the contention in our discussion above. In addition, the court in Helvering v. Rankin, supra, 295 U.S. at page 132-133, 55 S.Ct. at page 736, 79 L.Ed. 1343, stated that "even if the Board's decision had been based on an erroneous rule of law, that would not have justified its reversal, if the findings of fact, governed by the correct rule of law, were sufficient to sustain the decision and had substantial support in the evidence." We have already shown that this quoted statement is applicable here. Nor do we know of any legal principle that compels the Board to accept the exact valuations made by the interested parties. Surely there can be no dispute on the proposition that the Board in the exercise of its judgment and in the weighing of the evidence may fix an independent value.

■ It is true that the Board did not reveal in its opinion how it arrived at its conclusion that the value was 23 cents per square foot. Although omission in this regard is not ground for reversal, Helvering v. Rankin, supra, 295 U.S. at pages 132, 133, 55 S.Ct. at page 736, 79 L.Ed. 1343, we do believe that the criticism is justified. Our system of law ordinarily accords administrative findings the same respect as that given jury verdicts, and rightly so. Yet, the Board, a body of experts in tax matters, usually acts as a judicial tribunal, and often renders opinions justifying the decisions reached therein. For this reason, more can be expected of it. To disclose how the Board arrived at its conclusion is not expecting too much from it.

We fully appreciate counsel's wrath in this regard. We, too, have noticed how carefully and thoroughly the Board stated the facts and how it commented on the evidence and the methods of valuations. Omission of the way it arrived at its conclusion, after such completeness, is ground for suspicion. We, moreover, attach no such sacrosanctity to the process by which a tax value is reached.

Counsel also suggests that the Board had fixed the value by capitalizing earnings. This suggestion probably has its birth in the suspicion engendered from the omission to state the method upon which it arrived at its conclusion, as it can not be taken from reading the Board's opinion. However that may be, in a case where the administrative findings are warranted by the evidence, even if the Board had considered earning power as a basis of valuation, this would not have been declared improper, for ordinarily earning power is a very reliable guide in the determination of value.

The decision of the Board is affirmed.