## NATIONAL GROCERY COMPANY, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 76600.   Promulgated December 9, 1936.

*James D. Carpenter, Jr., Esq.*, and *John M. Enright, Esq.*, for the petitioner.

*Ralph E. Smith, Esq.*, and *Timothy C. Mooney, Esq.*, for the respondent.

**OPINION.**

SMITH: The first question presented by this proceeding is whether the petitioner is liable to tax under section 104 of the Revenue Act of 1928 upon its profits for the fiscal year ended January 31, 1931. That section, so far as material to this proceeding, is as follows:

(a) If any corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains and profits to accumulate instead of being divided or distributed, there shall be levied, collected, and paid for each taxable year upon the net income of such corporation a tax equal to 50 per centum of the amount thereof, which shall be in addition to the tax imposed by section 13 and shall be computed, collected, and paid upon the same basis and in the same manner and subject to the same provisions of law, including penalties, as that tax.

(b) The fact that any corporation is a mere holding or investment company, or that the gains or profits are permitted to accumulate beyond the reasonable needs of the business, shall be prima facie evidence of a purpose to escape the surtax.

In his deficiency notice the respondent stated:

After careful consideration of your protest dated July 19, 1932 and subsequent information furnished this office, the Bureau approves the revenue agent's conclusion that in accordance with the provisions of section 104 of the Revenue Act of 1928 your company has permitted its gains and profits to accumulate beyond the reasonable needs of the business instead of being distributed, which is construed as prima facie evidence of a purpose to prevent imposition of surtax upon its stockholders.

Does the evidence overcome this prima facie presumption? And, if so, was the petitioner "availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains and profits to accumulate instead of being divided or distributed", during the taxable year?

The petitioner was organized for the purpose of operating a chain of grocery stores. For a number of years after its organization the profits of the business were used in extending the chain. At some time prior to 1922 the petitioner began to invest a portion of its surplus profits in the purchase of bonds and stocks. Its balance sheet at January 31, 1922, shows its investment in bonds and stocks at $490,000 and $130,710, respectively. Its holdings of securities in subsequent years greatly increased. There was also, up to 1929, a very large increase in the market value of the securities acquired. Since 1929 the petitioner has not greatly expanded its grocery business. Its profits have been large but they have not been paid over to its sole stockholder in the form of dividends. Most of them have been invested in securities.

Petitioner's balance sheet at the beginning of the taxable year shows cash on hand of $1,332,332.28; notes receivable (Henry Kohl), $470,000; accounts receivable, $26,816.37; bonds, mortgages, and stocks, $2,838,718.07; and other current assets against actual liabilities (exclusive of reserves) of $1,180,879.07. At the end of the taxable year petitioner's balance sheet shows cash, $1,405,961.04; notes receivable (Henry Kohl), $610,000; bonds, mortgages, and stocks, $3,048,452.74; and other current assets against the actual liabilities (exclusive of reserves) of only $276,552.19. Its actual surplus at January 31, 1931, was $7,938,965.54.

The petitioner contends that this large surplus was of benefit to it in obtaining credit at banks and in enabling it to purchase merchandise at a low price. It appears, however, that the petitioner's credit had been excellent for many years prior to the taxable year and that it did not obtain loans from banks at a lower rate of interest simply because it had a large investment in bonds and stocks. Manifestly, the amounts invested in bonds and stocks were not used by the petitioner either in the taxable year or for several

years prior or subsequent thereto in its grocery business. We find as a fact that the petitioner's accumulation of earnings was far in excess of the "reasonable needs" of the corporate business.

We are also of the opinion that the evidence of record does not rebut the prima facie presumption created by the statute that the accumulation of earnings beyond the "reasonable needs of the business" was for the purpose of preventing the imposition of the surtax upon its sole stockholder. The evidence shows that Henry Kohl, personally, needed some of the profits of the business. Prior to the taxable year he had borrowed from the petitioner $470,000, and, during the taxable year, he borrowed an additional amount of $140,000. No interest was ever charged or paid upon these loans. If the amount borrowed during the taxable year had been distributed as a dividend the petitioner would have been subject to a large surtax upon it. By reason of the failure to pay the $140,000 as a dividend the petitioner escaped surtax upon that amount of income. See *William C. De Mille Productions, Inc.*, 30 B. T. A. 826.

Upon the evidence before us we have made the finding that the petitioner was "availed of" during the fiscal year ended January 31, 1931, for the purpose of preventing the imposition of the surtax upon its sole stockholder "through the medium of permitting its gains and profits to accumulate instead of being divided or distributed." Cf. *United Business Corporation of America*, 33 B. T. A. 83; *R. & L., Inc.*, 33 B. T. A. 857.

The petitioner contends that: "Section 104 of the Revenue Act of 1928, as construed and applied by the Commissioner of Internal Revenue, or his deputy, to the income of petitioner for the fiscal year ending January 31, 1931, violates rights secured to the petitioner under the Constitution of the United States." It has not, however, advanced any argument in support of this proposition in its brief, and the constitutionality of the provision is sustained upon the authority of *United Business Corporation of America* v. *Commissioner* (C. C. A., 2d Cir.), 62 Fed. (2d) 754; certiorari denied, 290 U. S. 635; *United States* v. *Tway Coal Sales Co.* (C. C. A., 6th Cir.), 75 Fed. (2d) 336; *Williams Investment Co.* v. *United States*, 3 Fed. Supp. 225; 77 Ct. Cls. 396.

Reviewed by the Board.

*Judgment will be entered for the respondent.*

---

MELLOTT, dissenting: The majority holding, that the act is not unconstitutional, is, in my judgment, correct. I have considerable doubt, however, that the tax and penalty prescribed by it should be assessed and imposed under the facts before us.

The petitioner corporation was not formed for the purpose of preventing the imposition of the surtax upon its shareholders. It was formed many years prior to the enactment of the income tax law and for the purpose, as set out in the prevailing opinion, "of operating a chain of grocery stores."

Was it "availed of" during the taxable year for the inhibited purpose? The respondent contends that it was. In his notice of deficiency it is stated that he "approves the revenue agent's conclusion that * * * [it] * * * permitted its gains and profits to accumulate beyond the reasonable needs of the business." Such determination apparently was made under section 104 (b) of the Revenue Act of 1928, which prescribes that such a finding is prima facie evidence of a purpose to evade the surtax.

It may, or may not, be significant that the respondent did not categorically find that petitioner was "availed of" for the interdicted purpose; but such finding must be made by this Board if it is to approve the deficiency. Before we make such finding, however, there should be at least a fair preponderance of the evidence to support it, and I am not satisfied that such requirement has been met.

The prevailing opinion makes reference to three or four facts relied upon as being particularly significant—that the profits, though large, were not paid over to the sole stockholder in the form of dividends but were invested partially in securities; that the surplus increased during the taxable year; and that the sole stockholder borrowed from the petitioner certain sums of money without interest. These are circumstances which should be considered, but I do not think, upon this record, that they are so indicative of the nefarious purpose as to compel the conclusion reached by the majority.

The respondent offered no evidence, except a statement of the cost and market value of the securities, prepared from the books of the company, and the income tax returns of the petitioner and its sole stockholder. The petitioner produced several witnesses. At the risk of unduly extending this discussion, I feel impelled to make reference to some of the facts established by the evidence.

The treasurer of the company, who had been associated with the sole stockholder for more than 30 years, stated that, in her opinion, the surplus was not in excess of the reasonable needs of the business. She testified that to carry on the business, to buy the large quantities of merchandise required, and to pay the other expenses of the business, required a large surplus and that even with the large surplus on hand, there were times when the company was short of cash and had to borrow temporarily from the banks in order to pay the invoices of incoming merchandise.

Kohl, the sole stockholder, when asked why he kept all of the earnings of the company in the business instead of drawing them out, stated, "I needed them in the business—always needed them in the business. I never had any too much money." He also stated that he always tried to hold the corporation ready at all times to buy, if necessary, a whole year's supply of merchandise, if he thought that it could make money by doing so. When asked if, in his judgment, it was necessary for it to be continuously in the position of purchasing supplies in such quantity, he answered: "Well, the more money you have got, the cheaper you can buy and the more independent you are and the more you are recognized—and everything depends upon your statement, see?" It had been the policy of the business since its establishment "to keep in the statement and in the business every possible dollar and let them accumulate for the benefit of the business." From the very beginning the sole stockholder had followed the policy of living simply, drawing only enough salary to live on and confining his expenditures outside of the business to his living expenses. In its first year the company operated three stores; in 1912, 57; in 1915, 171; in 1918, 268; in 1923, 388; and, as shown in the findings above, in 1928, 715, and in 1931, 815. This growth corresponded in a general way with the ambition of the sole stockholder, one witness telling us that when he had 3 stores his ambition was to have 10; when he had 10, his ambition was to have 50; when he had 50, then to have 100, then 500, then 1,000, etc. With this idea in mind the warehouses, garages, bakery, and other facilities of the petitioner were expanded accordingly and such facilities now have sufficient capacity to take care of twice the number of stores which it owned during the taxable year.

Kohl further testified that before 1930 he had considered the purchase of a chain of stores in Paterson, New Jersey. During that year he also carried on negotiations with the owner of some 500 or 600 stores for their purchase. This was a business of from $5,000,000 to $6,000,000. While the stores were not actually purchased during the taxable year, the fact that such purchase was contemplated is a significant circumstance which should be considered by this Board in passing upon the question at issue.

Petitioner sold approximately $20,000,000 worth of merchandise during the taxable year, and, by taking advantage of its discounts, earned almost a half million dollars. Its pay roll and rents alone amounted to $4,000,000 a year. During the taxable year it paid Federal income taxes of $103,616.60. If it and its officers had wished to avoid paying Federal taxes, a method far more efficacious than accumulating "an unreasonable surplus" could have been adopted.

For instance, it could have sold some of its securities, which had depreciated in value more than a million dollars, deducted its loss, and thus not only could have saved on its income tax for that year, but in addition could have adjusted its surplus and earnings so that its books would show an actual loss for the taxable year instead of a gain or profit.

The petitioner paid its sole stockholder more than $100,000 a year as a salary. This was reported by him in his income tax return and tax was paid accordingly. It was ample for his ordinary living expenses and there was apparently no good reason why he should pay out any more of the earnings of the corporation to himself. He paid a surtax of more than $8,000 on his salary and a total tax of more than $11,000 for each of the four years 1928 to 1931, inclusive.

William J. Field, president of a large bank, testified that in his opinion the capital and surplus of petitioner was not in excess of the reasonable needs of the business, pointing out that at that time "we were starting on a panic and panic conditions. No one could foretell the future at that time. The National Grocery Co. had a turn-over of over six to eight times its capital in the volume of business it did in those years * * *. They had experienced in previous years rather large losses on inventory and felt they should keep a considerable working capital and surplus to meet any additional losses they might encounter." He also pointed out that the accumulation in surplus invested in securities enabled it to show a better credit statement and to borrow whenever it wished at low rates of interest. Frank C. Ferguson, another bank president, testified to substantially the same effect.

Another circumstance worthy of more than passing consideration is the fact that petitioner's real estate holdings, as well as its stocks and bonds, had materially depreciated in value. This depreciation, though it had not been reflected in the balance sheet, was nevertheless a very real thing. The stocks and bonds had depreciated more than $900,000. The merchandise inventory, due to the general decline, had decreased approximately a quarter of a million dollars, while the fair market value of the real estate had a shrinkage in value, over and above the depreciation charged off, amounting to approximately $125,000.

Being concerned, as we are, with actualities—a rule which certainly should be applied when we are passing upon the applicability of a penal statute such as we have before us, and regardless of the fact that the books of the company reflected an addition to surplus, the above evidence clearly shows that during the taxable period before us there was no unreasonable accumulation of gains and profits.

Congress was very careful to limit this highly penal statute to corporations which were formed or availed of for the purpose of avoiding the imposition of surtax upon the shareholders. In the first case which came before this Board under the section as originally enacted (*United Business Corporation of America*, 19 B. T. A. 809; affd., 62 Fed. (2d) 754; certiorari denied, 290 U. S. 635), both this Board and the Circuit Court upon appeal properly stressed the importance of establishing by the evidence the unlawful purpose. It was there pointed out that if such unlawful purpose was shown to exist, then it was immaterial whether the accumulation be large or small. The ultimate question before us, then, is, was there a purpose to enable the shareholder to escape surtaxes. The test, said the Second Circuit Court of Appeals in *United Business Corporation, supra*, is "the state of mind itself, and the presumption does no more than make the taxpayer show his hand." This Board, in the recent case of *A. D. Saenger, Inc.*, 33 B. T. A. 135; affd., 84 Fed. (2d) 721; certiorari denied, 299 U. S. 577, added that "the display of that 'hand' does not relieve the taxpayer if it discloses the state of mind the statute condemns."

The inquiry as to whether there has been an accumulation of surplus beyond the reasonable needs of the business is not determinative of the ultimate question to be decided. Even if the evidence be sufficient to show that there was an unreasonable accumulation—which, however, I do not believe has been shown in this case—this merely raises a rebuttable presumption of the existence of the crucial purpose. Such presumption is overcome by the evidence in this case which shows an absence of such purpose. The corporation merely continued its long established practice of "ploughing its earnings back into the business." Indubitably it had in the earlier years no "purpose of preventing the imposition of the surtax upon its shareholders", for there was no surtax to escape. There had been no "sudden change of policy, coincident with large increases in the surtax rates, (which) might * * * betray a purpose to accumulate against a season more propitious for distribution." (*United Business Corporation, supra*.) It had pursued the same policy throughout the years.

In *Cecil B. DeMille*, 31 B. T. A. 1161, 1174 (on appeal to the 9th Circuit), the facts made a much stronger case for the respondent than the facts before us here; but it was pointed out that the taxes and penalties prescribed by the section "are not imposed because of effects; avoidance *per se* is not prohibited. It is the *purpose*, the intention motivating a course of conduct which is made controlling by the very words of the statute. Unless the *purpose* was to prevent

the imposition of surtaxes, the tax may not be imposed." This language was recently quoted and reaffirmed by the Board in *Sauk Investment Co.*, 34 B. T. A. 732, 738, and in the very last case which we decided under this section, *Almours Securities, Inc.*, 35 B. T. A. No. 11, the Board said, "There must be such an intent on the part of those who were responsible for the organization of the corporation, or for the conduct of its operations." In the *DeMille* case it was pointed out that the proof went well beyond mere denial of prohibited intent and showed affirmatively a plan necessitating the accumulation of earnings and "the end to which they might ultimately be used." The same, or stronger, language might be used here.

No case has come before the courts or this Board where a corporation engaged in a mercantile or industrial activity, organized prior to the enactment of the income tax law and which has consistently followed the policy of "ploughing its earnings back into the business", has ever been required to pay the tax and penalty imposed by the section in question. In practically every case in which such penalty has been imposed, a large portion of the corporation's assets had been conveyed to it at the time of its formation, or at a later time, by the principal stockholder or stockholders, or the corporation was "a mere holding company." Typical cases are the following: *United Business Corporation of America, supra; United Business Corporation of America*, 33 B. T. A. 83 (reversed on stipulation of the parties); *Keck Investment Co.*, 29 B. T. A. 143; affd., 77 Fed. (2d) 244; certiorari denied, 296 U. S. 633; *William C. DeMille Productions, Inc.*, 30 B. T. A. 826; *Cecil B. DeMille, supra; Fisher & Fisher, Inc.*, 32 B. T. A. 211; affd., 84 Fed. (2d) 996; *Irvington Investments Co.*, 32 B. T. A. 1165; *A. D. Saenger, Inc., supra; R. & L., Inc.*, 33 B. T. A. 857; affd., 84 Fed. (2d) 721; certiorari denied, 299 U. S. 588; *Edward G. Swartz, Inc.*, 33 B. T. A. 355; *Rands, Inc.*, 34 B. T. A. 1094; *Almours Securities, Inc., supra*. There is a substantial difference between the two classes of corporations, although I would not go so far as to say that the former could never be subjected to the penalty.

This being a "fact case", it is with some reluctance that I reach a conclusion at variance with that of the Member who heard the testimony of the witnesses and had the advantage of observing their manner and demeanor while testifying; but I feel that the evidence is not sufficient to justify the imposition of the penalty and accordingly I dissent.

STERNHAGEN, ARUNDELL, MURDOCK, LEECH, ARNOLD, and DISNEY agree with this dissent.