**NATIONAL GROCERY CO. v. HELVER-ING, Commissioner of Internal Revenue.**

No. 6324.

Circuit Court of Appeals, Third Circuit.

Oct. 21, 1937.

. McDermott, Enright & Carpenter, of Jersey City, N. J. (James D. Carpenter, Jr., of Jersey City, N. J., of counsel), for petitioner.

James W. Morris, Asst. Atty. Gen., and Sewall Key and A. F. Prescott, Sp. Assts. to Atty. Gen., and Harry Marselli, of Washington, D. C., for respondent.

John E. Hughes, of Chicago, Ill., Thomas G. Haight, of Jersey City, N. J., and Edwin J. Marshall, of Toledo, Ohio, amici curiæ.

Before BUFFINGTON and BIGGS, Circuit Judges, and DICKINSON, District Judge.

BUFFINGTON, Circuit Judge.

This case concerns the compulsory distribution and penalizing of corporate profits accumulated in excess of reasonable reserves and with intent to avoid surtax taxation. The statutory authority to impose the taxes rests on the Revenue Act of 1928, c. 852, 45 Stat. 791. Eight members of the Tax Board united in an opinion imposing the tax here involved, while seven others united in a dissenting opinion.

Turning first to the above-cited act, we note it provides:

"Sec. 104. *Accumulation of Surplus to Evade Surtaxes.*

"(a) If any corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains and profits to accumulate instead of being divided or distributed, there shall be levied, collected, and paid for each taxable year upon the net income of such corporation a tax equal to 50 per centum of the amount thereof, which shall be in addition to the tax imposed by section 13 and shall be computed, collected, and paid upon the same basis and in the same manner and subject to the same provisions of law, including penalties, as that tax.

"(b) The fact that any corporation is a mere holding or investment company, or that the gains or profits are permitted to accumulate beyond the reasonable needs of the business, shall be prima facie evidence of a purpose to escape the surtax." 26 U. S.C.A. § 104 note.

Since the taxpayer corporation in this case was created some years before the statute was enacted, it will be seen the warrant for imposing the tax and penalty is, first, that such antecedent corporation was, after the act was passed, "availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains and profits to accumulate instead of being divided or distributed," and, secondly, that the fact "that the gains or profits are permitted to accumulate beyond the reasonable needs of the business, shall be prima facie evidence of a purpose to escape the surtax."

The taxes here involved are for the year 1930, and from the above-quoted terms of the law it is clear that Congress did not force the distribution with penalization of all corporate profits but only where the profits "are permitted to accumulate beyond the reasonable needs of the business." Such being the conditions warranting taxation, it follows that the basic question is whether the profits here involved were accumulated beyond the reasonable needs of its business. If this basic fact is established, then, and then only, is such accumulation by the statute made "prima facie evidence of a purpose to escape the surtax."

Turning now to the facts of this case, we note the government called no witnesses and the proofs of the taxpayer were not contradicted. The case is clear of fraud or proof that the corporation was actuated by any purpose "of preventing the imposition of the tax upon its shareholders."

The uncontradicted proofs show that Henry Kohl, a foreigner, came to America in 1887 and was without money or property. He worked as a clerk in grocery stores for three years. By that time he had saved $217, and in 1891 became half owner in a $500 store and later on in a $250 additional one. Subsequently the partnership was ended by each partner taking one store. Thereafter Kohl bought two additional stores and was the first to use trading stamps in grocery stores. He drew nothing from his business save a bare living. In 1906 he incorporated his three stores under the name "Henry Kohl Company" and did business until 1911. The interesting story of the development of his business is best told in his own words.

The proofs show that dividends were declared in 1933, 1934, 1935, and 1936. None was declared in 1930, the taxable year here in question. The company accumulated bonds and stocks aggregating $2,989,-452.74, which at the end of that taxable year had shrunk by more than $943,517.42. As bearing on the question of avoiding taxation, it will be noted the company was in a position, if it sought to escape taxation, to have sold these securities and established a deductible loss. In that regard Kohl testified: "I did not refrain from paying dividends in the National Grocery Company in 1930 in order to avoid the payment of any government tax. I have never done that." Bearing on the corporation acquiring and holding some $2,900,000 of securities, in answer to the question, "Why did the corporation make investments in all these different kinds of stocks and bonds?" the witness testified, and as we have seen without contradiction, as follows: "To invest that money so that when we would need it we would have it. All corporations do that more or less. * * * We wanted to use it all the time. It was invested because we wanted to have the cash on hand. And those were the days there was very little investment. We had to have the money ready. What will you do with it if you don't invest it? * * * It was part of our business. We carried that money, of course, principally to have the money on hand and get something for it. At the banks you would only get 2 per cent at that time. Of course, you don't get anything now. So we bought some stocks and bonds which we could turn over. You know, you can turn that stuff over in the morning, in a couple of hours, and you have your money if you want it. The money was invested that way so that whenever we needed the money we could sell the securities and get the money. All corporations do that." The proofs make it clear that Kohl was, so to speak, obsessed with the idea of store acquisition and this was the keynote of his actions and business life. To use a homely phrase, his plan was to acquire more stores by "plowing back" into his expanding business the profits his company made. Had he followed this course as an individual businessman, instead of doing so as the sole owner of the stock of his corporation, such a course would not have subjected him to this tax. That the growth of this great business was the dominant purpose of all he did is proven by the—again uncontradicted—proof of the treasurer of the com-

pany who had worked with him for nearly forty years:

"It has been Mr. Kohl's policy from the formation of the business that he could make more money by reinvesting the earnings in the business than in any other type of investment. The reason the National Grocery Company invested money in a diversified list of stocks and bonds, was because the cash was always available when it was invested in that type of securities and meanwhile was earning money. The Company has never been financed or expanded through borrowed money. We have never borrowed money except on short term borrowings. The Company has never sold any stock or bonds to the public. All the expansions of the business have been out of earnings. I am one of the stockholders.

"When Mr. Kohl had one store he promised me he would have ten some day. After he had ten and he thought if I would stay a little longer maybe he would have a hundred, and that has always been his policy right along. Then as the money accumulated there was some competition that was troublesome and he expressed a desire to be able to buy them out some day.

"I believe in 1919 we had two hundred stores. At that time Mr. Kohl was figuring on having a thousand. When he got up to six and eight hundred stores his plan was to have two thousand stores. Our present warehouse was built to take care of between 1,500 and 2,000 stores. The present warehouse was built in the late twenties, and is a six story building. The bakery would supply probably one thousand stores in its capacity when built, but we are in process of rebuilding that now in order to put in modern machinery to take care of the stores that we hope to open. When the present machinery is installed it will double our present output. As far as the size of the building goes, the ovens and machinery will supply fifteen hundred stores."

In addition to the decline in securities value in 1930, aggregating some $943,517.42, the proof is that the company's merchandise shrank in value well on to a quarter million dollars, and the real estate declined in value $125,000. Moreover, the shares of stock in five large New Jersey banks—the company had over 8,000 shares —were unsalable during the year of bank closing, and, to use the words of a dealer, "None of the local bank stocks could have

been sold on January 1, 1931. The market for bank stocks entirely disappeared in the latter part of October, November and December 1930. They could not have been sold. They had no market value at that time." Armbruster, an experienced bank stock dealer, referring to the bank stocks owned by the National, testified: "The bank stocks could not have been liquidated in January, 1930, because we had declared a condition which started around the middle of December, 1929, and ended about April of 1930, where you could not trade in any of the stocks of the five large Jersey City banks."

While the personal credit of Mr. Kohl and his company, built up through years, was such that, as conceded by these witnesses, the credit of the company would not have been impaired by the declaration of dividends which were suspended during 1930, yet their uncontradicted proof also is that by following the course of prudence during this panic year the surplus accumulated was not "beyond the reasonable needs of the business."

Turning then to the basic question whether the retention of its available cash in this panicky condition of the company in 1930 was reasonable, we have the testimony of other outsiders. William J. Field, president of a large local bank, former president of the New Jersey Bankers Association, and with knowledge of the National Grocery Company, when asked whether in his opinion the capital and surplus of the National Grocery Company for the calendar year ending January 31, 1931, was in excess of the reasonable needs of the business, testified:

"I don't think it was in excess of reasonable requirements and reasonable safety of the business. The working capital at the end of 1930 was $3,700,000 odd. The working capital at the end of January 1931, was $4,500,000. We were starting on a panic or panicky conditions. No one could foretell the future at that time. The National Grocery Company had a turnover of from six to eight times its capital in the volume of business it did in those years. It is true that some of the other chain stores in the grocery lines had a turnover of from 10 to 12 per cent, but the National Grocery Company showed a much safer condition by turning over at a smaller percentage than the other companies. They had experience in previous years of rather large losses on inventory, and naturally

they should keep a considerable working capital and a surplus to meet any additional losses they might encounter. * * * This company had accumulated a surplus, a good part of which was invested in stocks and bonds. After the depression, in 1929, these securities went off very considerably in market value. Many of them were what was known as over-the-counter securities. There was a large proportion of bank stocks and it was found they went off in market value, bank stocks outside of New York City could not be sold even at the so-called market value in those times—the conditions that prevailed with bank stocks or stocks of banks located outside of New York City."

Frank C. Ferguson, president of the Hudson National Bank, after examining the balance sheets, statement of profits and the exhibits in the case, testified:

"In my opinion for the year ending January 31, 1931, the surplus of the corporation was not in excess of the reasonable needs of the business. In my opinion it was good sound business practice for the Company in that year not to declare any dividends, because in view of the times it was important to conserve all cash resources.

"I am familiar with the inventory of securities owned by the National Grocery Company in the year ending January 31, 1931. For the purposes of the business you would have to eliminate entirely from the statement of the National Grocery Company all the shares of stock in Jersey City and Hoboken banks, because they had no liquidity."

When asked what effect the depression had on the salability of local bank stocks, Mr. Ferguson testified:

"For a time we tried to peg the market and found it impossible. Had to let the market go. I could not sell the bank stocks of these banks with the possible exception of the Commercial Trust Company, which always maintained somewhat of a market. But the rest of the stocks, including my own bank's stocks, were absolutely unsalable at any time in this period.

"As I have already stated, those securities could not have been sold nor could they have been used as collateral securities for a loan."

Yet in view of this enormous depletion and shrinking of assets, the Commissioner —and the Board following his lead—in addition to the $103,616.60 income tax paid by the corporation, assessed an alleged deficiency of $477,360.68 here involved. We find in the record no justification for the Board so doing, and it is clear the Board did not pass on the uncontradicted proofs given by the taxpayer, but based its action on the report of an investigator. Indeed, in its opinion the Board says (National Grocery Co. v. Com'r, 35 B.T.A. 163):

"In his deficiency notice the respondent stated:

"After careful consideration of your protest dated July 19, 1932 and subsequent information furnished this office, the Bureau approves the revenue agent's conclusion that in accordance with the provisions of section 104 of the Revenue Act of 1928 [26 U.S.C.A. § 104 note] your company has permitted its gains and profits to accumulate beyond the reasonable needs of the business instead of being distributed, which is construed as prima facie evidence of a purpose to prevent imposition of surtax upon its stockholders."

To our mind, this does not meet the statutory requirement. On what was the right and statutory duty of the revenue agent based? Did he have the evidence we have quoted before him? What statutory effect does his report have? The fair market value of the securities owned on January 31, 1931, was $2,125,434.50 as against their cost of $2,989,452.74. The Board, by its own statement, considered "subsequent information furnished this office," and approved of "the Revenue agent's conclusion" and made this its warrant for imposing this tax. It construed this as prima facie evidence of a purpose to prevent imposition of surtax upon its stockholders. Acting on these foundationless prima facies, the Board drew the legal conclusion that "we are also of the opinion that the evidence of record does not rebut the prima facie presumption created by the statute." This, to our mind, was a non sequitur. The basic thing was for the Board to itself determine whether the "profits are permitted to accumulate beyond the reasonable needs of the business" and thereafter, and only thereafter, does the prima facies arise of the purpose to avoid surtax taxation. For aught that appears in the record, the Board made no such finding as the act requires, and this notwithstanding its attention was called thereto in the dissenting opinion: "It may, or may not, be significant that the respond-

ent did not categorically find that petitioner was 'availed of' for the interdicted purpose; but such finding must be made by this Board if it is to approve the deficiency. * * * The respondent offered no evidence, except a statement of the cost and market value of the securities, prepared from the books of the company, and the income tax returns of the petitioner and its sole stockholder." Indeed, in Starr v. Com'r (C.C.A.) 82 F.(2d) 964, 965, 967, certiorari denied in 298 U.S. 680, 56 S.Ct. 948, 80 L.Ed. 1401, it was held that, "so far as the finding by the Board is concerned, the facts are admitted and the finding is not a finding of fact at all but a mere conclusion which the facts do not support." In that connection see, also, Helvering v. Rankin, 295 U.S. 123, 55 S.Ct. 732, 79 L.Ed. 1343, The Ernest H. Meyer (C.C.A.) 84 F.(2d) 496, and Tex-Penn Oil Co. v. Commissioner (C.C.A.) 83 F.(2d) 518, affirmed in Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 57 S.Ct. 569, 574, 81 L. Ed. 755, where it is said: "The ultimate finding is a conclusion of law or at least a determination of a mixed question of law and fact. It is to be distinguished from the findings of primary, evidentiary or circumstantial facts. It is subject to judicial review, and, on such review, the court may substitute its judgment for that of the Board."

With this lack of fact proof thus called to the Board's attention, it called no witness to testify, but stood on the report of the revenue agent and the "subsequent information furnished this office."

This case, as we have said, involved no fraud or concealment. For twenty years before the Revenue Act was passed this taxpayer followed the lawful and prudent policy of "ploughing" its earnings into the expansion of its business. The expansion of its business increased its risks, and the accumulating of the earnings of profitable years was its bulwark against fires, earthquakes, floods, wars, depreciation, depression, protracted and costly strikes, boycotts, the preventing of employees from working, and the many unforeseen and unlooked for adversities to which business is subject. In this case we have the uncontradicted testimony that this great business needed the surplus it maintained. Its experience in the taxable year of 1930, with $900,000 shrinkage in its securities, with nearly a quarter of a million dollars depreciation in its merchandise and $125,000 in its real estate, and with the market for its large bank stock holdings non existent, what man familiar with the conduct of large business operations can say it was unreasonable for the company to protect itself against emergencies? No one was called to the stand to prove the contrary, and the ex parte opinion of a revenue officer, with no proof of his knowledge, ability, or experience in the conduct of such a business, was no proof at all.

Without entering into further details, we limit ourselves to holding that the Tax Board had before it no proof, substantial or otherwise, to support its imposition of this penal tax. Its judgment is, therefore, reversed.

BIGGS, Circuit Judge (dissenting).

I must respectfully dissent from the majority opinion of the court.

The statute under which the deficiency was here found by the Board of Tax Appeals is set forth in hæc verba in the majority opinion. The penalty required by the statute may be imposed only if the corporation is found to have accumulated an unreasonable surplus with the purpose of permitting its shareholders to escape surtax. United Business Corporation of America v. Commissioner, 19 B.T.A. 809, affirmed (C.C.A.) 62 F.(2d) 754, 755, certiorari denied 290 U.S. 635, 54 S.Ct. 53, 78 L.Ed. 552. The ultimate question therefore before the court in the case at bar is, Did the corporation accumulate an unreasonable surplus with the purpose of enabling its sole stockholder to escape surtax?

The statute creates a presumption of such a purpose upon the part of the corporation if its gains or profits are permitted to accumulate beyond its reasonable needs. Under the statute such an accumulation is prima facie evidence of that purpose in the corporation.

An examination of the authorities convinces me that the effect of the statute creating the presumption, in the case at bar, as stated in United Business Corporation v. Commissioner, supra, is simply to make the taxpayer show its hand; or, not to mix the metaphor, to show its state of mind. In the case of A. D. Saenger, Inc., v. Commissioner, 33 B.T.A. 135, affirmed (C.C.A.) 84 F.(2d) 23, certiorari denied, 299 U.S. 577, 57 S.Ct. 42, 81 L.Ed. 426, the Board stated that "the display of that 'hand' does

not relieve the taxpayer if it discloses the state of mind the statute condemns."

A state of mind, an intent or purpose may be proved in a number of ways. An accused may state what was in his mind at the time of the commission of the act subject to penalty. Generally such a person makes it plain that his purpose was an innocent one, that he did not possess the mens rea required by the statute. Such statements are received by courts generally with some skepticism, since under such circumstances avowals of innocence are much more common than declarations of guilt. The matter of proof generally is not allowed to rest upon the statements of the accused. The possession of the guilty mind or of the guilty purpose may be proven in other ways by other testimony.

In the case at bar the petitioning corporation had one stockholder, Henry Kohl. He had built the business of the corporation from the operation of 3 stores to 815 stores by January 31, 1931, the end of the tax year in which the alleged deficiency occured. He continuously contemplated the purchase or operation of additional units. His every effort was devoted to increasing the size of the petitioner's business.

He drew only sufficient salary to take care of his needs in a frugal manner. The profits of the petitioner, under Kohl's direction, were ploughed back into the business. The minority opinion of the Board and the majority opinion of the court find the reason for the accumulation of surplus by the petitioner to be Kohl's obsession to create an ever greater chain of grocery stores and that this was the primary reason for the accumulation of the large surplus. Such may be the reason, but such reason is not incompatible with a desire to prevent the imposition of a surtax upon the sole stockholder.

There are other facts. It is a fact that when Kohl was in need of funds he procured them from the corporation by loans, frequently without interest, rather than by the payment of dividends from the assets of the corporation. It was stated in United Business Corporation v. Commissioner, supra, where the court was dealing with loans very similar in their nature to those in the case at bar, "These loans are incompatible with a purpose to strengthen the financial position of the petitioner, but entirely accord with a desire to get the equivalent of his dividends under another guise."

There was such evidence before the Board that it might find, without regard to any presumption, that the surplus of the petitioner was permitted to accumulate beyond its reasonable needs for the purpose of permitting the stockholder to avoid surtax. For example, the profits of the petitioner were very large. For the tax year under discussion that profit was over $780,-000. In the three years preceding the tax year, the net profits of the petitioner were in excess of $800,000 annually. At the end of the taxable year the surplus of the corporation was more than $8,000,000; its liabilities were less than $1,000,000. Inventories on the other hand never exceeded $3,200,000, and accounts payable were never more than $400,000. Within the taxable year the petitioner loaned Kohl $140,-000. The total of all sums loaned by the petitioner to its stockholder from the time of its incorporation until the end of the taxable year was in excess of $600,000.

In view of the foregoing, it is my opinion that there was sufficient evidence upon which the Board could base the following findings: "We find as a fact that the petitioner's accumulation of earnings was far in excess of the 'reasonable needs' of the corporate business"; and; "We are also of the opinion that the evidence of record does not rebut the prima facie presumption created by the statute that the accumulation of earnings beyond the 'reasonable needs of the business' was for the purpose of preventing the imposition of the surtax upon its sole stockholder."

This finding of fact last quoted is inartistically presented, but the words used plainly indicate that the Board found that the accumulation of surplus beyond the reasonable needs of the petitioner's business was to the end that surtax might be avoided by the stockholder. In this connection it should be particularly noted that the loan of $140,000 by the petitioner to Kohl within the period of the taxable year did have the effect of permitting the stockholder to avoid imposition of surtax, otherwise unavoidable had the sum been paid to him as a dividend.

One question remains: Are the findings of the Board referred to findings of fact? In my opinion they are such, and therefore, being based upon sufficient evidence, cannot be disturbed. A. D. Saenger, Inc., v. Commissioner, supra; United States v. R. C. Tway Coal Sales Co. (C.C.A.) 75 F.(2d)

336; United Business Corporation v. Commissioner, supra; R. & L., Inc., v. Commissioner (C.C.A.) 84 F.(2d) 721; Helvering v. Rankin, 295 U.S. 123, 131, 55 S.Ct. 732, 736, 79 L.Ed. 1343.

The judgment of the Board of Tax Appeals should be affirmed.