Archbold van Beuren and Margaret Z. van Beuren v. Commissioner.
Van Beuren v. Commissioner
Docket No. 91970.
United States Tax Court
T.C. Memo 1963-280; 1963 Tax Ct. Memo LEXIS 64; 22 T.C.M. (CCH) 1428; T.C.M. (RIA) 63280; October 11, 1963
*64 1. Held, that petitioner Archbold van Beuren, in publishing Cue Magazine during the years 1955, 1956, 1957 and to October 31, 1958, under a license agreement with Cue Publishing Company, Inc., dated December 16, 1954, was engaged in a trade or business conducted for profit and is entitled to deduct whatever losses resulted from such publication. 2. Held, further, the license agreement between Cue Publishing Company, Inc., and petitioner was not negotiated at arm's length. Other considerations besides those stated in the agreement entered into the arrival at the price of $125,000 which petitioner agreed to pay Cue Publishing Company, Inc., annually for a license to publish Cue Magazine. A reasonable price for the rights and privileges granted to petitioner under the terms of the agreement was $75,000 annually and this amount should be used in computing petitioner's losses. *65 William R. Spofford, 1035 Land Title Bldg., Philadelphia, Pa., Charles S. Jacobs, Sherwin T. McDowell, and Donald D. Kennedy, Jr., for the petitioners. Colin C. Macdonald, Jr., for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner has determined deficiencies in income tax against petitioners as follows: Year
Deficiency
1955
$127,243.56
1956
83,641.49
1957
50,261.13
1958
96,885.83
The deficiency for 1955 was determined as follows: Taxable income as disclosed by re-
turn
$244,683.23
Unallowable deductions and addi-
tional income: (a) Schedule C Loss
$143,960.65
(b) Capital gain
1,412.50
(c) Rental income
5,229.42
150,602.57
Taxable income as corrected
$395,285.80
*66 Petitioners do not assign errors as to adjustments (b) and (c). They do, however, by appropriate assignments of error, contest adjustment (a) and that adjustment is explained in the deficiency notice as follows: The net losses claimed by you with respect to the publication of Cue Magazine, for the years and amounts indicated below, have been disallowed for the reason that they were not incurred in a transaction entered into for profit. In the event it is determined that the losses claimed were incurred in a transaction entered into for profit, then it is held that the rental payments incurred in connection therewith were unreasonable and excessive and are disallowed to the extent of $100,000.00 for each of the years 1955 to 1957, inclusive, and $83,333.33 for the year 1958. Other more or less minor adjustments for 1956, 1957, and 1958 were made by the Commissioner but they are not contested. Findings of Fact A stipulation of facts with numerous exhibits attached thereto and also a supplemental stipulation of facts with some exhibits attached were filed. These stipulations of facts are incorporated herein by this reference. Oral testimony was also received from several witnesses, *67 including petitioner Archbold van Beuren. Petitioners are husband and wife and reside at Newport, Rhode Island. Archbold van Beuren will sometimes hereinafter be referred to as petitioner. Petitioners kept their books and records and filed their Federal income tax returns on the cash basis of accounting and by calendar year. For the years 1955 through 1958, inclusive, petitioners filed their Federal income tax returns with the district director of internal revenue at Providence, Rhode Island. Cue Publishing Company, Inc., sometimes hereinafter referred to as Cue, Inc., is a corporation organized under the laws of the State of New York on February 25, 1935, for the purpose of publication and sale of Cue Magazine, a specialty consumer magazine sold primarily in the New York City area and having its principal office in New York City. Petitioner has been a member of the board of directors of Cue, Inc., from July 9, 1936, to the present, except for the period from December 16, 1954, to October 31, 1958. He was treasurer of Cue, Inc., from September 21, 1937, to September 25, 1942, and was president of Cue, Inc., from March 8, 1944, to December 16, 1954, and held no other offices *68 of Cue, Inc., on any other dates. Petitioner became a shareholder of Cue, Inc., in 1935 and at no time owned more than 25 percent of its outstanding stock. At no time have the petitioner and the members of his immediate family owned more than 33 percent of the outstanding stock of Cue, Inc. During the period from December 16, 1954, to October 31, 1958, petitioner owned no common or preferred stock in Cue, Inc., having exchanged his said stock as part of the plan to refinance Cue, Inc., for stock in Cubit Corporation, which corporation was formed for the purpose of obtaining two-thirds of the outstanding stock of Cue, Inc., and of which corporation Cue, Inc., became a subsidiary during this period. On October 31, 1958, petitioner was given 2,678 shares of the common stock of Cue, Inc., being 10 percent of all of the then outstanding shares of common stock, as an added inducement in the making of a loan to Cue, Inc., in the approximate amount of $275,000. During this entire period it was petitioner's custom to go to his office at Cue Magazine on an average of three to four days a week. From the time of the death of his parents in 1951 it was petitioner's custom to spend the first *69 part of each such working day at the office of Cue, Inc., then to leave for his private office at 30 Rockefeller Plaza and to return to Cue, Inc., during that day only as necessary. In 1935, the initial year of publication of Cue Magazine, gross income of approximately $40,000 was realized. In 1954, 1955, 1956, 1957, and 1958, the gross receipts, less advertising expenses, realized from the publication of Cue Magazine were as follows: Year
Amount
1954
$1,281,869.30
1955
1,303,342.32
1956
1,432,371.73
1957
1,536,034.12
1958
1,640,673.27
Cue, Inc., suffered a succession of losses in the publication of Cue Magazine from its incorporation in 1936 through 1942. With the advent of the war years, the financial situation became more favorable for Cue, Inc. The larger magazines were having problems getting adequate paper supplies and advertising space was being curtailed by them. As a result, Cue, Inc., received a considerable amount of advertising business which it could not have obtained under normal business circumstances when the advertising media of the larger magazines would have been available. Also as a result, Cue, Inc., showed a profit for the first *70 time in 1944, which continued through the year 1946. After the end of the war, business operations returned to normal and Cue, Inc., returned again to successive loss years from 1947 through 1954. The net profits and losses of Cue, Inc., before taxes and before net operating loss deductions for the years 1940 through 1954 were as follows (losses in parentheses): Year
Amount
1940
($238,301.25)
1941
( 141,663.87)
1942
( 97,238.97)
1943
( 1,796.88).l1944
107,509.39
1945
132,015.50
1946
41,208.92
1947
( 48,566.81)
1948
( 132,248.54)
1949
( 139,197.09)
1950
( 67,867.13)
1951
( 89,839.02)
1952
( 108,125.12)
1953
( 7,879.85)
1954
( 45,312.99)
In December 1949 Cue, Inc., commenced borrowing from the Bank of New York by negotiating an original loan of $215,000 at 2 1/2 percent interest. This loan was collateralized by petitioner with securities which he owned. The loans and security deposits were steadily increased over the subsequent years until on May 28, 1953, Cue, Inc., had borrowed therefrom $500,000 and petitioner had deposited as security therefor securities which he owned. During the period from December 1949 to February 25, 1955, Cue, *71 Inc., made no repayment of principal on the loans. In connection with a prior reorganization in 1945, Cue, Inc., had issued convertible notes and debenture notes in the total amount of $73,650 which were to mature on December 31, 1954. The board of directors of Cue, Inc., recognized early in 1954 that the corporation faced a financial crisis upon the maturity date of these notes as Cue, Inc., had no liquid assets, no cash, and no possibilities of earnings sufficient to meet payment. At a meeting of the board held on January 27, 1954, this financial crisis was discussed and a committee appointed to examine into any possible reorganization of the corporation that would result in ability to meet its obligations. This committee consisted of Harry H. Van Aken, former counsel of Cue, Inc., during its previous reorganization in 1945; J. Wallace Winslow, a director and secretary of Cue, Inc., and also financial advisor to petitioner; and, in the role of consultant to the committee, Harold Mahnken, a professional financial advisor, who had developed the 1945 reorganization plan. After investigation, this committee reported to the board of Cue, Inc., in September 1954 that no possible plan *72 of reorganization within its own capital structure could be devised and that Cue, Inc., would have to look to the financially strong stockholders, of which petitioner was one, for financial help and assistance. It was understood by Cue, Inc., that petitioner was unwilling to, and would not, guarantee loans to Cue, Inc., in excess of $500,000. In 1954, petitioner was advised by his tax advisors and believed that any payments required to be made by him to the Bank of New York because of his obligations as guarantor of Cue, Inc.'s $500,000 bank loan would be deductible by him for Federal income tax purposes as ordinary losses rather than capital losses. However, petitioner also knew that respondent was contending at that time that such losses would constitute capital losses which could be deducted by him for Federal income tax purposes only to the extent of capital gain which was a minor element in his income. The Van Aken-Winslow committee reported its conclusions to the board of directors of Cue, Inc., at its regular meeting held on September 29, 1954. It recommended that substantial creditors and stockholders of Cue, Inc., be approached to provide additional working capital, and *73 the committee was discharged. During the summer of 1954, Harold Mahnken, financial consultant to the Van Aken-Winslow committee, first suggested to petitioner the idea that he might lease the business of Cue, Inc., and publish Cue Magazine for his own account. After the Van Aken Winslow committee reported on September 29, 1954, its conclusion that the financial position of Cue, Inc., was such that there appeared to be no feasible means of recapitalizing the company within the bounds of its own capital structure, petitioner then began to seriously consider the advisability of his leasing the business of Cue, Inc., to publish Cue Magazine for his own account. Between September 29, 1954, and October 27, 1954, petitioner discussed the prospects for the future profitable operation of Cue Magazine with persons who, through long association with Cue Magazine, were familiar with the publishing industry in general and Cue Magazine in particular. Among the persons with whom petitioner discussed this matter were the members of the board of directors of Cue, Inc., Van Aken, who was a member of the committee appointed to investigate the possibility of recapitalizing Cue, Inc., and C. Coudert *74 Nast, Cue, Inc.'s counsel. These persons were consulted by petitioner and gave it as their belief that the prospects for the future profitable operation of Cue Magazine were good. On October 27, 1954, petitioner informed the board of directors of Cue, Inc., that he would be willing to lease the business of Cue, Inc., to publish Cue Magazine for his own account if mutually satisfactory terms could be negotiated. He further informed the board of directors that he would divest himself of all Cue, Inc., stock and resign as an officer and director of Cue, Inc., if a satisfatory license agreement could be concluded. Immediately subsequent to October 27, 1954, the board of directors of Cue, Inc., directed the corporation's counsel, C. Coudert Nast, to draft a license agreement. Van Aken and Winslow concluded that an annual license fee of $125,000 was satisfactory on the basis of future annual earnings they forecasted for Cue Magazine. In the course of their study of the possibility of recapitalizing Cue, Inc., Mahnken, Van Aken, and Winslow had forecasted that Cue Magazine in the future would earn a minimum of $50,000 annually and a maximum of $250,000 annually under optimum business *75 conditions and under circumstances where the financial handicap of the outstanding debt of Cue, Inc., was no longer there. After Van Aken and Winslow had so concluded that $125,000 would be a satisfactory annual license fee, they reported their conclusion to Nast and petitioner. Petitioner decided to lease the business from Cue, Inc., for a period of 5 years at an annual license fee of $125,000, which had been proposed by Van Aken and Winslow. Loeb, who is currently a director and the vice president of Cue, Inc., and the publisher of Cue Magazine, has been associated with Cue since 1937, and in 1954 he was a director and the treasurer of Cue, Inc., and circulation manager of Cue Magazine. Petitioner was aware that the license fee of $125,000 would be applied by the licensor in reduction of the outstanding debt of Cue, Inc., to the Bank of New York, thereby releasing the pledge of petitioner's collateral security to said bank and that this would greatly improve the financial condition of Cue, Inc. In November 1954, a memorandum for submission to Cue, Inc., shareholders was prepared by petitioner with the assistance of Mahnken, Nast, Van Aken, and Winslow. This memorandum stated, *76 amoung other things, as follows: Cue Magazine has shown remarkable progress in building circulation for the past several years from around 60,000 to over 100,000 at the present time. Advertising revenue has also increased but not to the same extent as expenses, which have been hit by higher costs of paper, printing and payroll. As a result the Company has sustained deficits during most of the recent years and will be in the red again in 1954. The financial position of Cue Publishing Company, Inc. as of October 31, 1954 shows liabilities of $728,000.00 versus current assets of $122,000.00, and a capital deficit of $427,000.00, as per attached balance sheet. The fact that Cue has been able to continue operating is by reason of a demand bank loan of $500,000.00 with a New York bank, securred by collateral securities belonging to Archbold van Beuren. Cue is faced with a crisis on December 31st, 1954 by reason of the maturity at that time of $73,650.00 of notes issued at the time of the reorganization plan of 1945. The directors last January appointed a committee to explore the possibility of meeting these notes when due but no feasible way within the corporation appeared possible and *77 instead the only practical plan appeared to be through the intervention of a group of individuals interested in saving the Cue organization and its potentially valuable product. A workable method had to be delayed until after Congress had passed the revised tax law and a definitive plan has only just been arranged. The plan for saving Cue and realizing the utmost benefit to all of the noteholders, preferred and common share holders was worked out by Mr. Harold Mahnken who prepared the Cue reorganization back in 1944. In essence it provides that Cue Publishing Co., Inc. will lease for a period of five years their property and the rights to publish Cue to Archbold van Beuren, as an individual operating under the title of Cue Publishing Company. The present corporation would thus be in receipt of funds to apply towards repayment of the $500,000.00 bank loan and other liabilities. It is expected that the new Cue Publishing Company will be able to operate at a profit and that in due course the magazine property will have substantial value. Since Archbold van Beuren is at present the largest single holder of Cue securities, he cannot deal with himself in the matter of a lease and, for *78 this and other reasons, it is proposed that a new corporation by the name of Cubit will be organized to acquire two-thirds of the outstanding stock of the present Cue preferred and the present Cue common stock, and thus Cue Publishing Co., Inc., will become a subsidiary of Cubit Corporation. Cubit Corporation, an investment company, will initially offer to exchange its shares for Cue Preferred shares on a one for one basis and for Cue common stock at a ratio of eight shares of Cue common for one share of Cubit. At the same time it will exchange its own shares on a one for one basis for shares of Bush Terminal Buildings Company common stock, which currently has a value on the over-the-counter market of upwards of $12.00 a share. Under the present tax law, the holders of Cue stock who exchange their shares for Cubit Corporation will carry their cost values assigned to the Cubit shares they receive. It is obvious that the Cue shares going into Cubit which have a high cost value will represent a potential capital loss. On the other hand, the stockholders of Bush Terminal Buildings Company (which incidentally owns Bush House in London) will also carry into Cubit their cost values. The Bush *79 Terminal Building stockholders who are coming into Cubit have very low costs on their stock and such acquisition will represent a potential capital gain. As the Bush Terminal Building stockholders exchanging for Cubit will represent control of Cubit, it is obvious that Archbold van Beuren's interest in Cubit will be that of a minority stockholder and he will run into no difficulties of dealing with himself in negotiations with old Cue Publishing Co., Inc. The present stockholders of Cue Publishing Co., Inc. who exchange for Cubit will receive the values of $12.00 per share for Cue preferred and $1.50 per share for Cue common stock, and will retain the benefits of any capital loss if they should wish to sell their Cubit holdings. There is no question but that there will be a market for Cubit stock at the values just mentioned, and the present Cue holders can in 1955 expect to receive at least $12.00 for their old Cue preferred and $1.50 for old Cue common if they wish to sell. On the other hand, if they prefer to stay with Cubit, they should ultimately receive higher values since Bush Terminal Building stock appears to have a potential worth of from $15.00 to $25.00 a share. If *80 the Cubit Corporation plan does not become operative it would appear almost certain that the present Cue Publishing Co., Inc., would face bankruptcy on December 31st, and that its preferred and common shares would be worthless under such a situation. Time is of the essence therefore and the decisions of Cue stockholders who are offered the right to exchange for Cubit Corporation should be had before the special meeting of Cue stockholders expected to be called on December 8th or thereabouts. By December 16, 1954, petitioner had exchanged all of his Cue, Inc., stock for stock in the Cubit Corporation in accordance with the over-all plan of the officers and directors of Cue, Inc. On that date he resigned as an officer and director of Cue, Inc. Subsequent to petitioner's resignation as an officer and director of Cue, Inc., petitioner and the then president of Cue, Inc., C. Coudert Nast, signed a license agreement on December 16, 1954. Under this agreement, effective January 1, 1955, petitioner leased from Cue, Inc., its property and the right to publish Cue Magazine for his own account for an initial term of 5 years in consideration of an annual license fee of $125,000. At petitioner's *81 option the license agreement was renewable for a further aggregate term of 5 years. The license agreement contained the following termination agreement: 8. Van Beuren or the corporation referred to in the next preceding paragraph to which this license agreement shall have been assigned may terminate his or its obligations and liabilities hereunder on not less than three months' notice in writing and may thereafter at the termination of said notice period of three months discontinue the publication of "Cue" magazine and the conduct of the business incident thereto. The execution of the license agreement by the president of Cue, Inc., was ratified by the board of directors of Cue, Inc., on December 16, 1954, and by a majority of the shareholders of Cue, Inc., on December 29, 1964. On March 10, 1955, a minority shareholder of Cue, Inc., Emanuel N. Josephson, instituted suit in the Supreme Court of the State of New York, County of New York, against Cue, Inc., petitioner, and others. Josephon had been a shareholder of Cue, Inc., since 1949 and throughout the period during which he held shares in Cue, Inc., he was active in protecting his interests as an investor and acted independently. *82 The suit sought cancellation of the December 16, 1954, license agreement and alleged that the agreement was grossly unfair to Cue, Inc., and that the annual license fee in the amount of $125,000 was grossly inadequate compensation to Cue, Inc. This suit was not decided on the merits because plaintiff failed to post the bond required under New York law. Petitioner, trading as Cue Publishing Company, published Cue Magazine for his own account under the license agreement dated December 16, 1954, commencing on January 1, 1955. The license agreement was terminated by petitioner on October 31, 1958, by written notice given in accordance with the terms thereof, and he ceased publishing Cue Magazine for his own account on that date. On October 31, 1958, Cue Inc., resumed the publication and sale of Cue Magazine which it has continued to publish and sell until the present. Under the termination agreement entered into by the parties, petitioner agreed to loan to Cue, Inc., $75,000 for working capital and to further loan to Cue, Inc., an amount up to $200,000 sufficient to pay off the then outstanding indebtedness to the Bank of New York, thus releasing petitioner's sizeable block of stock *83 pledged in security thereof. As additional inducement to make such loan available, petitioner was given, without further consideration, 2,678 shares of the common stock of Cue, Inc., which amount was equal to 10 percent of all of the then outstanding shares of such common stock. Pursuant to the license agreement petitioner paid to Cue, Inc., annual license fees in the amount of $125,000 in each of the years 1955, 1956, and 1957, and license fees in the amount of $104,166.66 in 1958. The license agreement was terminated on October 31, 1958. Petitioner, trading as Cue Publishing Company, sustained losses in the publication and sale of Cue Magazine in the amounts of $143,960.65, $97,596.71, $57,819.65, and $110,873.07 in each of the years 1955, 1956, 1957, and 1958, respectively. These losses were incurred by petitioner after the payment of the above-mentioned license fees. Petitioner leased from Cue, Inc., the right to publish and sell Cue Magazine for the purpose of earning a profit and the transaction was entered into for profit. The publication and sale of Cue Magazine by petitioner constituted a trade or business carried on by him for profit. The license agreement between *84 Cue Publishing Company, Inc., and petitioner Archbold van Beuren dated December 16, 1954, was not negotiated at arm's length. Other considerations besides those stated in the agreement entered into the arrival at the price of $125,000 which van Beuren agreed to pay Cue, Inc., annually for a license to publish Cue Magazine. A reasonable price for the rights and privileges granted to van Beuren under the terms of said agreement was $75,000 annually. Opinion BLACK, Judge: We have endeavored to make full findings of fact in this proceeding and therefore it will not be necessary to repeat them in this Opinion, except to the extent of endeavoring to make plain the reasons for our decision on the issues involved. The issues involved in this case are as follows: 1. Did petitioner engage in the publication and sale of Cue Magazine during the period January 1, 1955, to October 31, 1958, as a trade or business for profit or a transaction entered into for profit, though not connected with a trade or business, with the result that losses sustained by him from publication during this period were deductible for purposes of Federal income tax. 2. In the event we should determine that the *85 losses claimed were incurred in a trade or business for profit or in a transaction entered into for profit, though not connected with a trade or business, then were the rental payments incurred in connection therewith unreasonable and excessive and, if so, how much rental under the license agreement would be reasonable and proper. We shall take up and decide the issues in their order. Issue 1 The applicable statute to Issue 1 is section 165(a), (c)(1) and (2) of the 1954 Code. [1]
In this case there is no issue as to the amount of the losses which were claimed by petitioner as deductions in the publication of Cue Magazine except as it may be affected by the license fees paid. Paragraph 24 of the *86 stipulation reads: 24. Cue Publishing Company sustained losses in the publication and sale of Cue Magazine in the amounts of $143,960.65, $97,596.71, $57,819.65 and $110,873.07 in each of the years 1955 through 1958, respectively, after payment of license fees at the rate of $125,000 per year to Cue, Inc. pursuant to the agreement dated December 16, 1954 (Joint Exhibit 18-R), which losses petitioner claimed on separate schedules C attached to his Federal Income Tax Returns Form 1040 for the said years, and which respondent has disallowed for the reasons set forth in his statutory notice of deficiency. Respondent has disallowed the deduction of the losses on the ground that they were not incurred in a transaction entered into for profit. Respondent has also made the determination in his deficiency notice that in the event it is determined that the losses were incurred in a transaction entered into for profit, then it is held that the rental payments incurred in connection therewith were unreasonable and excessive and are disallowed to the extent of $100,000 for each of the years 1955 to 1957, inclusive, and $83,333.33 for the year 1958. The alternative determination constitutes *87 Issue 2. We have made a finding of fact that petitioner leased from Cue, Inc., the right to publish and sell Cue Magazine for the purpose of earning a profit and the transaction was entered into for profit. Our function is not to determine whether petitioner used good judgment in taking over the publication and sale of Cue Magazine under the circumstances stated in our Findings of Fact - the statute does not commit any such function to us. It simply says that if an individual incurs a loss in a trade or business, or in a transaction entered into for profit, though not connected with a trade or business, he shall be allowed such loss as a deduction. It seems to us that under the familiar definition of the Supreme Court, in Flint v. Stone Tracy Co., 220 U.S. 107, of what it takes to carry on a business, petitioner was carrying on a business in the publication and sale of Cue Magazine. In the Flint v. Stone Tracy Co. case the Supreme Court defined a trade or business as "That which occupies the time, attention, and labor of men for the purpose of a livelihood or profit." That the publication of Cue Magazine constituted a trade or business, we think, is evidenced by the *88 fact that approximately 50 persons were employed in the operation, and substantial gross income was derived from its publication. Our Findings of Fact show that the gross receipts which petitioner received from the publication of Cue Magazine were as follows: Year
Amount
1954
$1,281,869.30
1955
1,303,342.32
1956
1,432,371.73
1957
1,536,034.12
1958
1,640,673.27 We do not think it can be said that a publication with that amount of receipts from its publication and sale was not carrying on a trade or business within the meaning of the statute and the Supreme Court's decision in Flint v. Stone Tracy Co., supra. Respondent, however, contends that petitioner was not carrying on the business of publishing Cue Magazine for a profit. There is much evidence in the record on that subject and from that evidence we are convinced that petitioner's purpose in assuming the role of publisher of Cue Magazine was to make a profit. He may have had other purposes but that certainly was one. Therefore, we have made a finding of fact which reads: "Petitioner leased from Cue, Inc., the right to publish and sell Cue Magazine for the purpose of earning a profit and *89 the transaction was entered into for profit." It is true that petitioner testified he did not expect to make an immediate profit but that within a reasonable time he expected to make a profit from the publication of the magazine. He testified categorically to that effect and we think there is ample evidence in the record to establish the profit motive in the publication of the magazine. On Issue 1 we decide for the petitioner. Issue 2 There is much evidence in the record which we think bears, either directly or indirectly, on this subject and we have given it all careful consideration. The applicable statute is section 162(a)(3) of the 1954 Code. [2]
Petitioner had one expert witness, William T. *90 Gayle, who testified at length on this subject. The upshot of his testimony was that he considered the license fee of $125,000 annually a reasonable price to pay for the publication and sale of Cue Magazine. In Helvering v. National Grocery Co., 304 U.S. 282, the Supreme Court reversed the Third Circuit which had reversed the Board of Tax Appeals in 35 B.T.A. 163. Mr. Justice Brandeis said in the concluding part of his opinion: Fifth. The court [meaning the Third Circuit which had reversed the Board of Tax Appeals] expressed the opinion that the Board failed to consider relevant and controlling facts, that it relied upon improper evidence in reaching its conclusion, and that it failed to make the findings required by the statute. There is nothing in the record to justify that view. The findings quoted above are specific. The Board was not obliged to accept as true Kohl's statement of his intention and purposes; or to accept as sound the opinion of his experts. It was error to reverse the decision of the Board. * * * Section 25.110, 4 Mertens, Law of Federal Income Taxation, p. 324, deals with the subject of the reasonableness of rentals paid. We think *91 it correctly states the rule wherein it says as follows: Sec. 25.110. - Reasonableness of Amount. * * * In every instance the determination of the propriety of the deductibility of the ostensible "rent" is one of fact. Accordingly, the character of the payments which are being examined must be judged in the light of all the terms and conditions of the agreement and also in the light of all the facts and circumstances existing at the time the agreement was executed. * * * There is a great deal of evidence in this proceeding. There were many exhibits attached to the stipulations of facts which were filed and there was much oral testimony. From this evidence we are convinced that the $125,000 license fee was not paid in its entirety for the right to publish and sell Cue Magazine - it was only paid in part for that purpose. It seems to us that there were other considerations and motives which entered into the payment of the $125,000 license fee. We have, therefore, made a finding of fact that - The license agreement between Cue Publishing Company, Inc., and petitioner Archbold van Beuren dated December 16, 1954, was not negotiated at arm's-length. Other considerations besides those *92 stated in the agreement entered into the arrival at the price of $125,000 which van Beuren agreed to pay Cue, Inc., annually for a license to publish Cue Magazine. A reasonable price for the rights and privileges granted to van Beuren under the terms of said agreement was $75,000 annually. In a computation under Rule 50, $75,000 should be used as the amount paid for the license fee by petitioner instead of the $125,000 claimed by petitioner for such purpose. Decision will be entered under Rule 50. Footnotes
1. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * *↩
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * *
(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.↩